# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued December 12, 2005　　　　　Decided July 21, 2006

No. 02-3015

UNITED STATES OF AMERICA,

APPELLEE

v.

SAMUEL CARSON, *A/K/A* CHIN,

APPELLANT

————

Nos. 02-3016 & 3017

UNITED STATES OF AMERICA,

APPELLEE

v.

VINCENT HILL, *A/K/A* VITO,

APPELLANT

————

No. 02-3018

UNITED STATES OF AMERICA,

APPELLEE

v.

WILLIAM KYLE SWEENEY, *A/K/A* DRAPER,

APPELLANT

2

No. 02-3019

UNITED STATES OF AMERICA,

APPELLEE

v.

JEROME MARTIN, JR., *A/K/A* PIMP,

APPELLANT

———

No. 02-3046

UNITED STATES OF AMERICA,

APPELLEE

v.

SEAN COATES, *A/K/A* BIRDY,

APPELLANT

———

Appeals from the United States District Court
for the District of Columbia
(No. 98cr00329-01)
(No. 98cr00329-02)
(No. 98cr00329-03)
(No. 98cr00329-04)
(No. 98cr00329-06)

———

*Stephen C. Leckar*, appointed by the court for Sean Coates,
*Steven R. Kiersh*, appointed by the court for William Sweeney,
and *Reita P. Pendry*, appointed by the court for Jerome Martin,
argued the cause for all appellants. *Paul Rosenzweig*, appointed

by the court for Samuel Carson at the time the brief was filed, *Christopher M. Davis*, appointed by the court for Vincent Hill, *Mary E. Davis*, appointed by the court for Vincent Hill, and *Jensen E. Barber*, appointed by the court for Vincent Hill, were on the joint brief. *Edward Charles Sussman*, appointed by the court for Samuel Carson, entered an appearance.

*Mary B. McCord*, Assistant United States Attorney, argued the cause for the appellee. *Kenneth L. Wainstein*, United States Attorney, *Peter R. Zeidenberg*, Attorney, United States Department of Justice, *John R. Fisher*, Assistant United States Attorney at the time the brief was filed, and *Roy W. McLeese III* and *Anjali Chaturvedi*, Assistant United States Attorneys, were on brief. *Elizabeth Trosman* and *Patricia A. Heffernan*, Assistant United States Attorneys, entered appearances.

Before: HENDERSON, RANDOLPH and GRIFFITH, *Circuit Judges*.

Opinion for the court filed *Per Curiam*.

PER CURIAM: The five appellants challenge their convictions and sentences on various counts of criminal activity involving drugs, guns and violence. For the reasons set out below, we affirm their convictions and their sentences *in toto*.

## I. Facts

This case is a story of mayhem and disorder in and around the 200 block of K Street, Southwest, in the District of Columbia from the 1980s until 1998. Underlying the violence was appellants' organized and massive business of selling drugs, for which they stand convicted of participating in a narcotics conspiracy to distribute over 1,000 kilograms of marijuana. According to evidence believed by a jury, that drug business led to an astonishing amount of violence and a seemingly complete repudiation of civil society and respect for human life. Individual appellants in this case, sometimes acting in concert,

stand convicted of the murders of eleven people: Melody Anderson, Anthony Fortune, Alonzo Gaskins, Chrishauna Gladden, Maurice Hallman, Leonard Hyson, Terita Lucas, Darnell Mack, Teresa Thomas, Donnell Whitfield, and Larry Wright. Some appellants also were convicted for numerous attempted murders, crimes of violence, and firearms offenses. All appellants were convicted for a racketeering conspiracy.

The beginning of the end of the K Street drug network came in late 1995, when the Federal Bureau of Investigation ("FBI" or "Bureau") started a comprehensive investigation into illegal drug sales in the area. FBI Special Agents set up an observation post from an apartment overlooking the 200 blocks of K and L Streets, Southwest, and started videotaping drug transactions, sometimes taping transactions they initiated through undercover work but often capturing unsolicited purchases. FBI video cameras captured appellants Vincent Hill, Jerome Martin, Samuel Carson, and Sean Coates in the midst of drug transactions, and an undercover Metropolitan Police Department ("MPD") officer made several controlled purchases of marijuana from appellants Hill and Martin. Appellant William Sweeney was incarcerated when some of these purchases took place.

The FBI's investigation lasted three years and suggested a long history of drug-dealing and an extraordinary breadth of violent acts. Crucial to the government's case was testimony from former associates of appellants and nearby residents—testimony that was undoubtedly difficult to obtain given evidence, as discussed below, that some of the appellants have a history of murdering or attempting to murder potential witnesses against them. Not every detail is known about appellants' lengthy pattern of lawlessness that preceded their indictment in 1998. Largely recounting the testimony of those cooperating witnesses, we provide below a chronological overview of the vast drug activity and violent acts underlying the jury's guilty verdicts. Our summary is by no means

exhaustive of all facts underlying that activity. It serves to set the factual background upon which we later build in the analysis section of our opinion, where we address in greater detail the facts needed to understand appellants' specific challenges.

A. *Factual Background.*

This story begins with the criminal actions of appellant Vincent Hill. Several associates of appellants, cooperating with the government either voluntarily or pursuant to plea agreements, testified at trial that they grew up learning to sell drugs from Hill beginning as early as ages eleven to fourteen. One cooperating witness described it as a "big brother/little brother relationship," where he would beat up others at age eleven, get congratulated by Hill, be promoted to the role of "lookout" where he could protect Hill's drug activity, and eventually "graduat[e] into [dealing] drugs as the other guys" did. Hill would sell drugs in Southwest D.C. and have other individuals sell drugs for him, providing binoculars and walkie-talkies so that his underlings could warn him if police were approaching.

By the 1990s, appellants and a number of individuals (collectively, the "K Street dealers" or "K Street members"), were selling marijuana in and around the 200 block of K Street, Southwest, which continued through 1998. Over time, the K Street dealers developed an increasingly large and loosely organized drug-selling network. For example, as one seller described it, the group would "go in a sequence," with each seller taking a turn in serving the next arriving buyer. If a buyer "was to pull off with somebody's bag" and without paying, the dealers would "yell down the street" and "before that car could get out of the area somebody would have thrown a brick . . . [or] bottle" and, "[i]f someone had a gun at night . . . they would actually fire at the car."

The K Street dealers sold marijuana in and around K Street throughout the morning, afternoon, and evening. During 1994 and 1995, appellant Hill made the most money out of the group, taking in approximately $200 to $1,000 per day selling drugs. By 1996, appellant Hill made roughly $3,000 to $4,000 in illicit profits per week, while appellants Coates, Martin, and Sweeney made a little less. In addition to dealing marijuana, appellants Carson and Sweeney would help supply other members of the group. Perhaps predictably, appellants' drug-dealing was surrounded by a culture of violence and intimidation, which, according to the evidence introduced at trial, grew each year.

i. *1989.*

The widespread violence that runs through this case begins in 1989 with the murder of Larry Wright, a victim in a drug-dealing turf war. A local dealer, Andre Murray, testified at trial that he and Tyrone Brawner sold drugs together at First and P Streets, Southwest, while appellant Hill, along with Wayne Perry, sold drugs in another part of the K Street neighborhood. In the beginning of the summer of 1989, Murray testified, Wright was released from prison and resumed dealing drugs, but did so on what Murray and Hill viewed as the wrong side of K Street. A short time later, on the evening of June 29, 1989, Murray heard gunshots fired and saw Hill at the corner of First and O Streets, Southwest, running away. Larry Wright had been murdered.[1]

---

[1] An eyewitness, Reginald Switzer, testified to seeing Hill stand behind Wright just before Wright was shot. Another individual recounted that shortly after the shooting, Hill had blood on the lower part of his leg, and remarked that "if anybody come looking for me, I was right here gambling with you all." In threatening people in the neighborhood in later years, Hill made various statements suggesting he had killed Wright.

Several murders followed.  In late 1989, Carson, along with another K Street dealer who cooperated with the government, James Montgomery, murdered Maurice Hallman as revenge for a previous fight.  According to Montgomery, while Montgomery was "hustling" on Delaware Avenue, Southwest, Hallman punched him, at first in a playful manner and in an effort to show off to appellant Hill.  Montgomery asked Hallman to stop.  When he did not, Montgomery "put [his] stash down and . . . came back and . . . hit him . . . to the body hard."  Hallman, Montgomery testified, "got mad" and hit Montgomery on the head with a gun.  That altercation prompted Montgomery to tell Hallman, in front of several witnesses, that he was "going to get him."  Appellant Carson chided Montgomery for having "threatened [Hallman] in front of other people" and suggested that "if something happened to [Hallman], then [Montgomery] would be the first one they would come and get."  Montgomery then apologized to Hallman in front of "everybody" so "everybody could see that [they] made up."

That apology did not go far.  Montgomery killed Hallman on December 19, 1989.  According to his own testimony, Montgomery was in possession of Hallman's gun and used it to lure him to an alley—"somewhere where [he] could kill him."  Carson accompanied Montgomery.  Another individual, Leonard Hyson, was present and would not leave, despite Carson's request that Hyson "go ahead about his business."  Montgomery shot Hallman until he ran out of bullets.  When he was done, he saw Hyson lying on the ground, with Carson walking away.  Montgomery later told Carson that when he was shooting Hallman, he had not heard Carson's gun go off.  Carson told him "that's because he's sharp" and that "he hit [Hyson] in the head six times before he hit the ground."[2]

---

[2] Another individual, Raymond Washington, repeatedly discussed with others the death of Hallman and Hyson.  Montgomery told

ii. *1990.*

Norman Yusuf Simmons, then only fifteen years-old, was kidnapped by appellant Coates and other individuals on April 28, 1990. Simmons was riding a bike in a park when two individuals approached him with semi-automatic weapons. They forced Simmons into a car, drove him to a mall, and eventually to an apartment complex. Simmons was placed into a trunk, and then into a second car. He was driven to another apartment, asked at gunpoint for contact information from his family, and then put in a closet. Simmons was eventually taken to a wooded area and bound with black electrical tape. Thereafter, his captors brought him to a parking lot, where he was informed that his family had paid a ransom.

iii. *1991.*

In 1991, appellant Carson stored an AK-47 and other guns at the home of Teresa Thomas, with whom he was in a romantic relationship. Seventeen year-old Teresa lived with two infant daughters, her eighteen year-old sister Terita Lucas, and another woman, Crystal Bobbitt. Carson asked Thomas to return the AK-47, but according to Montgomery, Thomas "kept giving [Carson] excuses" about the gun. Appellant Martin accused Carson of "going soft over a broad" and suggested that Thomas was "going to end up letting [Carson] get killed by his own gun." The father of one of Thomas's daughters was a man from the 5th and O Street neighborhood, and apparently Martin was concerned that this man would take Carson's guns from

---

Carson that Washington was "running his mouth about that situation." Montgomery thought "that [they] should kill" Washington, which Carson did not initially want to do himself. But one day, when Montgomery believed Washington was "in a good position" such that he could "hit him where he is now," Carson told Montgomery: "[i]f you can do it, then do it." When Montgomery got his gun, Washington was gone, and Montgomery "just left it alone" after that.

Thomas's apartment and use them against him. Carson told Bobbit that he did not "trust" the man having "a gun on him" and thus "had to stay strapped" when he visited. Bobbit saw about five guns stored in a bag under Thomas's bed.[3]

On March 22, 1991, Bobbitt returned to the apartment after having spent the previous night with family in Maryland. Entering with her child, she saw what appeared to be "all this juice in the room," and soon discovered that she was, in fact, seeing not juice, but blood. Bobbitt found Thomas dead, with Thomas's daughter still alive under Thomas's body. Bobbitt ran to seek help. Police officers arrived to find Thomas and Lucas dead, with three young children alive in the apartment. There were no signs of a forced entry. Pictures of Carson that had been in the apartment were missing.

According to Montgomery, Carson initially denied being responsible for the double murder. Later, Carson described to Montgomery what happened. Carson went to Thomas's apartment and "kept asking her about the gun," and Thomas "kept on saying that she'll get the gun for him, but she couldn't get it right now because it was behind a lot of stuff, and she didn't want to wake her kids up." Thomas "kept giving him excuses," and so Carson went to the bathroom, came out, and "shot her in the head." Next, he murdered Lucas. Lucas was in her bed, and as she was "lifting up, and before she opened her eyes," Carson "shot her in the head, and she just laid back down." Carson then fled to a waiting car driven by Clifton Edwards.

---

[3] One of Thomas's friends testified that she spoke with Thomas the night Thomas was killed. Thomas appeared to be "very fussy" and "frantic." Thomas had recently broken up with Carson, and the friend recalled seeing Thomas, a week earlier, take a "quite heavy" gym bag from under her bed and run with it downstairs.

Carson shot and killed Anthony Fortune in August 1991, after a dispute between Martin, Carson, and Fortune in a craps game. Carson described the killing to Montgomery, recalling that he had shot Fortune and after Fortune fell Carson "went over top of him [sic] and hit him some more." A witness saw Martin and Carson earlier, and heard Martin talking about how he "didn't like Tony Fortune robbing people, and [how Fortune] would kill your mother." Later that evening, the witness saw Carson "walking towards Tony Fortune, shooting." Carson "then stood over [the] top of him and shot him."[4]

Curtis Buchmon, a friend and associate of appellants Martin and Carson, was murdered on September 3, 1991. Appellants Martin and Carson, along with others, believed that Buchmon was killed in retaliation for Fortune's murder. Martin, Montgomery, and others engaged in an initial unsuccessful attempt to, from Montgomery's perspective, go "shoot somebody" and "get some get-back for them killing" Buchmon. They ended up shooting at a white minivan, but fled after the van sped off. On September 10, 1991, their next attempt to seek revenge ended in a shootout with the MPD. The group found two people they were looking for, but their targets began to run away. Soon thereafter, a car passed the group's van, and began shooting at them. But Montgomery saw more shots coming at them from another direction. Someone who looked like a security guard was shooting at Martin, and Martin, along with other occupants of the van, returned fire.

The "security guard" was one of four MPD officers who witnessed the shoot-out and returned fire into the van. Police found the van abandoned in the 1300 block of 45th Place, Southeast, riddled with bullet holes. A D.C. driver's permit

---

[4] Years later, Arthur Rice indicated to Carson that he had always thought Martin shot Fortune and had recently heard that it was Carson. Carson laughed, and responded: "well, now you know."

issued to "Jerome Martle," apparently belonging to appellant Jerome Martin, was found in the driver's side door. Police found six sets of fingerprints in the van, three of which matched the known fingerprints of Montgomery and appellants Martin and Carson.

iv. *1992.*

Several months later, there was yet another shooting. When appellant Coates heard that a man named Michael Jones was planning to testify against one of Coates's associates, Coates told others that "we need to get him." Coates, along with other individuals, shot Jones multiple times on June 28, 1992. Jones survived.

v. *1993.*

Coates, Sweeney, and others continued to engage in violent acts during 1993. At about 2:00 a.m. in the early morning hours of a day in October 1993, a resident of Oxon Hill, Maryland was awakened to the sound of four individuals outside. When she looked out her window, she saw four men arguing with Anthony Pryor, who was in a truck. The men demanded that Pryor get out of the truck. When Pryor complied, the men began to fight him. Pryor started to run, until he was shot twice by one of the assailants and kidnapped. The witness did not know the identity of the kidnappers, but saw the door to the trunk of the assailants' car left in the street after they fled with the victim. A witness living at the Arthur Cappers housing complex in the District of Columbia testified that at around 3:00 a.m. he heard noises outside. He saw a car pull up with appellant Sweeney and other individuals in it. The car "had no trunk." Sweeney and others got out, took off their clothes, and tossed them into a trash can. Police arrived to find the car without a trunk door and various items around it. There were bloodstains on the rear bumper, and clothing items, car parts, and duct tape were scattered all around. Fingerprints from appellant Coates were found on the car.

Coates later told Montgomery that he and others "had robbed . . . somebody . . . and . . . put them in the trunk" and "the person they kidnapped" had "ended up breaking the trunk off the car."[5]

vi. *1994.*

On September 26, 1994, a witness heard several gunshots fired outside his home on K Street and saw appellant Sweeney running away from a craps game with a gun in his hand. The witness went outside and saw Donnell Whitfield dying. Another government witness talked to Sweeney prior to Whitfield's death, and Sweeney indicated that Whitfield had "smacked him" at a club and that he planned to kill Whitfield because of that incident. Sweeney told the witness after the shooting that he had, in fact, killed Whitfield.[6]

---

[5] Another witness testified that, before Pryor's kidnapping, he had heard of a plan, led by appellant Hill, to kidnap Pryor because "[h]e had plenty of money" and "[t]hey wanted the money." Sweeney later suggested to a cell-mate that Hill "kept playing him all the time," promising assailants in the Pryor kidnapping, for example, $5,000 for their participation, yet they received nothing.

[6] Montgomery recounted that Sweeney later bragged to Montgomery and appellants Carson and Coates about having "hit [Whitfield] a few times" and having gone "over top of him and hit him some more," after Whitfield previously "smacked [Sweeney] in the face." The term "hit," Montgomery explained, was usually used by the group to mean that someone "shot" someone. Two other witnesses recounted that Sweeney made substantially the same admission to them. A firearms expert testified that ammunition casings recovered from the scene of the Whitfield murder matched a gun recovered from Sweeney's grandmother's house. The expert concluded that bullets recovered from the scene and Whitfield's body "could have been fired" from that gun, but was not able to "positively determine" that this had been the case. The expert noted that the serial number on the barrel of the gun did not match the serial number on the frame of the gun, which "suggests that this barrel . . . could have been replaced."

vii. *1995.*

K Street member Donald Nichols testified that in 1995 appellant Hill informed appellant Martin, along with Nichols, Switzer, Paul Franklin, and Gary Price, that James Coulter "needed to be killed because he was hot." Coulter was shot in May 1995. After Coulter was shot, Nichols heard Hill tell Martin that Martin "should have used two guns" and lament the fact that Martin's gun had jammed. Montgomery later heard Martin telling Coates and Carson, "they keep trying to push it on me," and that "they [were] trying to say that [Martin] had something to do with [Coulter] getting shot." Martin claimed, however, that "they can't prove it" because he "had a mask on." Martin attempted to discourage witnesses from testifying about the shooting of Coulter. Later, Hill told an MPD Detective that "all your snitches are going to die, including your little buddy who is over at the hospital now with four holes in him under the name of John Doe . . . in Room 2299." Coulter was in the hospital, registered under the name of John Doe, in what was supposed to have been an undisclosed room.

viii. *1996.*

On June 26, 1996, a witness for the government standing in the 200 block of K Street saw Carson shoot Ulysses English. Another witness heard shots fired, saw English fall, and saw Carson running away. Carson was upset, Montgomery recounted at trial, that English told Buchmon's killers where Carson's mother resided. Carson told Montgomery that if Montgomery saw English in the K Street neighborhood, he should let him know, or, "if [Montgomery] s[aw] him in a good position, to hit him"—that is, to "kill him." When English survived, Carson told Montgomery that he did not think English "was going to snitch."

A few months later, on August 30, 1996, Demetrius Hunter was approached by Carson and Coates about where they could

buy approximately seven pounds of marijuana. Hunter took Carson and Coates, along with Ronald Horns, to an apartment in Northeast Washington, D.C. The four went into the apartment and met individuals Hunter referred to as "a Jamaican named Mark" and "a Jamaican named Joe." Joe informed the group that he did not have all the marijuana they needed in the apartment and offered to get it from another location. Carson gave Joe $5,000 and left with Joe to retrieve the marijuana. The residents of the apartment started "playing" with firearms, according to Hunter, when Coates received a call from Carson. Carson informed Coates that he had been sitting in front of another apartment building waiting for Joe to return, but Joe was nowhere to be found. Carson returned with Raymond Washington, and Mark asked Carson and Washington to come back the next day. Mark, whose real name was Popa Mark Phillip, did not "know what's up with Joe" because Joe had "never do[ne] that before." But as the group began to head out, Carson pulled out a gun and opened fire on Mark and, Hunter recounted, "another Jamaican." Washington pulled out a gun as well. The group fled the building, but Washington continued to chase Mark outside and then shot him.

A robbery that year by K Street members resulted in the triple murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson. Carson, Sweeney, and other K Street members went to Las Vegas in 1996 to see the Evander Holyfield/Mike Tyson boxing match. Carson saw Gaskins win about $50,000 in Las Vegas. Carson, Montgomery, and Sweeney discussed robbing Gaskins, hoping to get $250,000 and divide it three ways. They planned to use money from the Gaskins robbery to kill Thomas Fields and others from a nearby neighborhood on L Street.

Montgomery explained that the group conducted significant surveillance on Gaskins in Temple Hills, Maryland. Then, on the day of the attempted robbery, Sweeney brought a .40 caliber Glock firearm and a stun gun, and after further preparation, the

group arrived at Gaskins's craps house. Montgomery and Sweeney jumped out of the group's van, but Coates stayed behind. Without attempting to rob Gaskins, Sweeney shot Gaskins, shot Mack, and then shot Anderson on his way out. When confronted by Montgomery as to why he started shooting everyone, Sweeney claimed that Gaskins was reaching for a weapon, which Montgomery disputed.[7]

A feud with individuals from L Street also developed in 1996. K Street member Charles Edwards was killed by L Street member Joey Simmons in July 1996 because Edwards had publicly expressed, according to a government witness, "where he could sell his weed," telling others that "nobody runs no blocks" and he "can sell this weed anywhere." Simmons and Ronald Sowells, another L Street member, were shot in response to Edwards's shooting. Appellants Hill and Carson, along with other K Street members, were also shot during the feud.

On October 30, 1996, Coates shot Sowells at the Anacostia Metro Station. An associate of Sowells, Eric Gordon, previously shot Coates's associate and co-defendant, Hill, and Sowells was now in the same car that he had used to drive Gordon to and from that shooting. Carson pulled up to Sowells's car and Coates began firing. Sowells returned fire until his gun jammed. Coates later admitted to Montgomery that he shot Sowells with Montgomery's gun.[8]

---

[7] Police recovered twelve .40-caliber shell casings from the scene. Sweeney's fingerprint was found on the storm door of the house. Sweeney later complained to another inmate that Montgomery "was telling on them" about "a case that he was in in [sic] Maryland, a triple homicide." Sweeney threatened to kill Montgomery if he encountered him. Carson later complained to another that the triple murders were about "a money issue, a robbery" and if Montgomery "would never have opened up his mouth," they "would have beat the case."

[8] Coates believed that he had killed Sowells because Sowells

The year 1996 continued to be violent. K Street members attempted to kill several witnesses, resulting in one murder. During this time period, appellant Martin, along with Antonio Knight, had been arrested for murdering Curtis Edwards, who had been in a car with Keith Jones and Richard Burton. While in jail pending trial, Martin kept in contact with Paul Franklin. According to Franklin, in discussing the Edwards murder, Martin spoke "of two people, a female by the name of Robin, and a guy by the name of Flip." Martin wanted to know where Robin lived and wanted Franklin to pass that information on to Carson, which he did. Although Franklin was aware that Martin "wanted Robin dead" and that Robin was a witness at Martin's trial, Franklin testified that he showed Carson where Robin's home was. Montgomery also testified that Franklin told him Martin was trying to get in contact with Montgomery and needed Montgomery "to get on top of some witnesses for him."[9] Carson enlisted Montgomery's help in murdering Flip, but they were ultimately unsuccessful.[10]

Appellant Carson was concerned, Montgomery recounted, that they "needed to stay on top" of "getting at these witnesses"

---

stopped returning fire. Coates and Montgomery fought over who would get rid of the gun, but eventually Coates showed Montgomery where the gun was, and Montgomery threw it in the Potomac River by Fort McNair. Police recovered the gun from where Montgomery disposed of it.

[9] An inmate incarcerated with Martin testified that Martin "said he wasn't concerned about [the murder case against him], because he had someone that was going to take care of that."

[10] After "three or four" attempts to find Flip, they gave up during their last attempt because they found a crowd of people at the location Flip was reported to be at, and, according to Montgomery, they "didn't know exactly how many people in the crowd had guns." Carson was concerned that they "might be outgunned."

and needed to "approach it like a full time job." One day, Carson picked up Montgomery, bought some gardening gloves at Safeway so they would not leave fingerprints, got his gun, and left to find Robin and one other witness, Chrissy. Carson and Montgomery went to 37th Place, where they heard Robin and Chrissy would be at a party, and went inside a vacant house to wait for their arrival. Chrissy, whose real name was Chrishauna Gladden, arrived with several friends. According to Montgomery, about an hour later when Chrissy left the party, Carson ran out, put his hood on, and fired several shots into Chrissy. Chrishauna Gladden died that night of October 5, 1996. An FBI Special Agent working on the Edwards case testified that other witnesses "were scared to death" after the murder of Gladden and several refused to testify. Martin and Knight were acquitted.

Around the same time, Maurice Proctor, indicted with appellants in this case, and Kenneth Adams were charged for a 1994 murder of Phil Clayborne, who was believed to be testifying against two K Street members. According to Arthur Rice, an inmate incarcerated with Proctor, Proctor suspected that now Adams "was cooperating [with the police] because he kept leaving the jail for no reason." After Adams was released from prison, Rice and Proctor got on the phone with Carson, who believed Adams was living in Northern Virginia.

As described by Montgomery, Carson eventually got Adams's phone number and was able to retrieve his address in Centreville, Virginia. Carson and Montgomery made six to eight trips to Centreville in planning and attempting to murder Adams, sometimes accompanied by Sweeney and Coates. Montgomery testified at trial about various attempts being thwarted.[11] The K Street members' attempt on Adams's life

---

[11] For example, because the group was concerned about driving into and out of Virginia carrying a gun, they buried a gun in the woods

eventually ended when a cooperating witness informed the government that the K Street group knew Adams was in Centreville and was planning to kill him.

ix. *1997.*

K Street members sought to kill yet another government witness in 1997, but this time proved successful. When the FBI opened its investigation in 1995, Robert Smith, one of the main suppliers of marijuana to Southwest, was immediately a focus of the Bureau's inquiry. Smith was arrested after a sting operation and agreed to cooperate, describing for the FBI his drug-related activities and several crimes of violence committed by appellant Sweeney, his relative, and Sweeney's associates. An FBI Special Agent conducting the investigation testified that Smith and the Bureau tried "to make sure that nobody on the street thought that [Smith] was cooperating." That effort proved unsuccessful. After Sweeney was arrested for the triple murders in Temple Hills, he realized, according to Montgomery's testimony, that Smith was the only person he told about the murders. Carson told Montgomery that if the group "hit [Smith], then [the government] don't have no case, but eventually, they was going to come and get us, if we don't hit" Smith. After that, Carson and Montgomery would look for Smith when they were out and about in Southwest. Although they saw him a number of times, he was never alone.

On June 16, 1997, Carson borrowed Montgomery's car. Later, Montgomery heard that Smith had been shot on Half Street, Southwest. Carson returned that evening and, after discussing the fact that Smith had been killed, told Montgomery, "man, trust me, we're all right," and returned Montgomery's car keys. Carson directed Montgomery to stay away "from up Half

---

near Adams's home. But when they returned one day to use it, it was missing.

Street" and "not to drive" the car if he "didn't have to." Smith was shot eleven times, seven of which were in the head.

B. *Procedural Background.*

On September 18, 1998, appellants and several others were indicted on counts of narcotics conspiracy, racketeering conspiracy, murder and other crimes of violence, narcotics trafficking, and weapons possession. Appellants moved to sever various counts and defendants, but their motions were denied. A jury trial commenced on November 15, 2000 and deliberations began on July 9, 2001. The district court dismissed pursuant to Federal Rule of Criminal Procedure 23(b)(3) one juror, which appellants challenge on appeal. Throughout July and August 2001, the jury returned guilty verdicts against appellants on numerous counts and not guilty verdicts on several counts, and found some racketeering acts proven and others not proven. Each appellant moved for a new trial or sought to join a co-defendant's motion for a new trial. The district court denied appellants' motions. Appellants filed timely notices of appeal, invoking our jurisdiction to review the judgments of conviction pursuant to 28 U.S.C. § 1291.

## II. Dismissal of Juror During Deliberations

First, each of the five appellants challenges his conviction on the grounds that the district court erred in dismissing Juror No. 3 during deliberations and in permitting the remaining eleven jurors to deliberate to verdict pursuant to Federal Rule of Criminal Procedure 23(b). At the time of the trial, Rule 23(b) (since amended[12]) provided in relevant part:

---

[12] The rule was amended in 2002 "as part of the general restyling of the Criminal Rules to make them more easily understood and to make style and terminology consistent throughout the rules." Fed. R. Crim. P. 23 Advisory Comm. notes to 2002 Amendments. Among the changes, the term "just cause" was replaced with "the more familiar

**(b) Jury of Less than Twelve.** Juries shall be of 12 but at any time before verdict the parties may stipulate in writing with the approval of the court that the jury shall consist of any number less than 12 or that a valid verdict may be returned by a jury of less than 12 should the court find it necessary to excuse one or more jurors for any just cause after trial commences. Even absent such stipulation, if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors.

The district court's decision under this rule to dismiss a juror or to continue with an eleven-member jury is reviewed for abuse of discretion. *See United States v. Ginyard*, 444 F.3d 648, 651 (D.C. Cir. 2006) (dismissal of juror); *United States v. Harrington*, 108 F.3d 1460, 1472 (D.C. Cir. 1997) (eleven-juror verdict). We conclude the district court did not abuse its discretion in dismissing Juror No. 3 and permitting the remaining eleven jurors to continue deliberating to verdict.

The jury began deliberations on July 9, 2001 and the district court dismissed the alternate jurors at that time. On Thursday July 19, 2001 the judge informed counsel he had learned from U.S. Deputy Marshall Terry Adams that Juror No. 3 had "transported himself to the Veterans Administration Hospital with symptoms of chest pains and a tingling sensation in one arm, which were to him sufficiently suggestive that he was having coronary problems." 7/19/01am Tr. 3. The court also told counsel that Deputy Adams was going to the hospital to "try to ascertain more information about the situation" and then excused the jury until the following Monday, July 23, when "hopefully they w[ould] be able to resume their deliberations . . . with Juror Number 3 present." *Id*. at 4. He stated that, if Juror

term 'good cause.'" *Id*.

No. 3 was not present when the jury returned on July 23, he would ask the parties to stipulate to proceeding with an eleven-person jury but, "failing such a stipulation," he would "exercise [his] prerogative under Rule 23(b) to have the jury of 11 continue to deliberate and take their verdict." *Id*. He then explained the situation to the other jurors and excused them until Monday morning. On Monday morning, Juror No. 3 was present and deliberations continued.

On Tuesday July 24, 2001 the judge assembled counsel and placed Deputy Adams on the witness stand to describe "difficulties . . . with respect to Juror No. 3." 7/24/01pm Tr. 4. Adams testified that, after Juror No. 3 left for the hospital the previous Thursday, Juror No. 17 informed Adams that "in the last couple of weeks" Juror No. 3 told her "he had experienced some mental health issues in the past and had been treated for them" and that "he was experiencing difficulty with his supervisor" about not reporting to work on days the jurors were not in court. *Id*. at 4-5. Juror No. 3 had also informed Juror No. 17, Adams recounted, that he "bought a 'thing' and planned to do 'her'—an unidentified 'her'—and himself." *Id*. at 5. She explained to Adams that she "took the word 'thing' to mean 'gun.'" *Id*. In response to Adams's questioning of her, Juror No. 17 further explained she had not reported the conversation earlier because she was "scared." *Id*. at 6. Later the same day (the previous Thursday), Adams testified, Juror No. 3 called Adams from his cell phone and reported he had seen a doctor and had a "secondary appointment for that afternoon in the same hospital" in the "mental hygiene unit." *Id*. at 6. At the judge's request, Adams then drove to the hospital and brought Juror No. 3 back to the courthouse for questioning. At this point the judge interrupted Adams's testimony to state on the record that upon his return to the courthouse on Thursday, Juror No. 3 admitted he had not experienced chest pains and arm tingling, as he had informed Adams, but had "personal problems," which "were, to a certain extent, being exacerbated by pressure from his

supervisor to work when he was not on jury service." *Id*. at 7. Juror No. 3 assured the court, however, he was prepared to return to deliberate on Monday.

Adams resumed his testimony and stated that earlier that Tuesday afternoon he received a phone call from a member of his staff advising that Juror No. 3 wished to see the courthouse nurse. The nurse checked the juror's vital signs and reported they were normal. Later that afternoon, Adams was again approached by Juror No. 17, accompanied this time by Juror No. 1, the foreman. The two jurors "relayed some concern about Juror No. 3's health and overall well-being" and informed Adams that "everyone on the jury had the same concern." *Id*. at 9. When they asked Adams to relay their concerns to the judge, he told them they should write a note and he would deliver it to the judge. They expressed reluctance because they were "receiving pressure from Juror Number 3 not to do so," explaining that he "was making comments referencing homicide, and suicide and certain violent tendencies." *Id*. Adams repeated that they should communicate to the judge through a written note, which they did shortly before the judge summoned counsel. The judge informed counsel that the note stated "in essence": "We wish to speak to you directly on a matter of considerable importance, and we wish to do so right away." *Id*. at 10. It was signed by Juror No. 1 and Juror No. 17. After informing counsel of the note, the judge brought Juror No. 1 and Juror No. 17 into the courtroom.

The judge asked Juror No. 1 to act as "spokesperson." 7/24/02pm Tr. 10. Juror No. 1 expressed concern that because of "external factors, his job and other concerns that are mounting on him to the point that he is visibly despondent and is concerned for his safety," Juror No. 3 was "just not contributing to the deliberations" and was "not fully there as far as being involved with the deliberations." *Id*. at 11-12. Juror No. 17 stated in turn that Juror No. 3 admitted he was "having

problems staying focused because of problems with his job." *Id*. at 12. Both jurors responded affirmatively when the judge asked: "If [Juror No. 3] were to be excused from further deliberations, do you think that you would be able to progress more rapidly with respect to reaching a verdict?" *Id*. at 12.

The following morning, Wednesday July 25, 2001, defense counsel requested that the court "bring Juror Number 3 out individually and have the court conduct somewhat of an open-ended voir dire of the juror" to determine whether the testimony regarding his conduct was accurate. 7/25/01am Tr. 4-5. They also informed the court that "on the state of this record" they were "opposing the striking of this juror." *Id*. at 5. The government suggested recalling Adams to put on the record various disclosures Juror No. 3 had made to him (as recounted by Adams in a conversation with government counsel the preceding evening)—specifically that Juror No. 3 had had a drinking problem, had taken trazodone hydrochloride, a medication administered for depression, had recently been in possession of a gun and lived in a neighborhood with a crime problem—which admissions, the government argued, were "directly at odds with what he revealed in his jury questionnaire." *Id*. at 6.

Adams returned to the witness stand and confirmed that Juror No. 3 had made the disclosures the government identified. He also expanded on his conversation the day before with Juror No. 1 and Juror No. 17, testifying they told him Juror No. 3 had warned them they "had better not write a note" to the judge and "had better not turn him in." *Id*. at 10. Juror No. 17, who was "animated and agitated," told Adams she took the warning as a "threat" and was "scared to write a note." *Id*. at 11. Adams further testified that, during his conversation with the two jurors, Juror No. 3 "kept running back and forth" between the jury room and where Adams was speaking with the other two jurors, urging them to continue deliberating. *Id*. One of the other two

24

jurors—Adams was not sure which—told Juror No. 3 he "need[ed] to take care of this matter" and Juror No. 3 "started talking about his supervisor at work," repeating "she is just messing, she is just messing with me." *Id*. at 11-12. Then, getting "real agitated," he said "I just want to hit something" and made a motion in the air with his arm as if to do just that. *Id*. at 12.

After questioning Adams, defense counsel sought to question Juror No. 1 and Juror No. 17 to determine whether the latter had expressed fear of Juror No. 3, whether Juror No. 3 was in fact having difficulty participating in deliberations and, if so, whether the difficulty was the result of a personality conflict or of differing views of the case. When the judge declined, defense counsel asked that the judge question Juror No. 3 on whether he felt he could meaningfully participate in the deliberations. The judge denied this request as well, explaining that he had "already asked that of him in chambers when he was brought . . . from the hospital" and "notwithstanding his own belief to the effect that he can participate, that, in fact, he cannot." *Id*. at 41.

When Juror No. 3 was brought to the courtroom, the judge questioned him briefly about the subjects earlier noted by the government. Juror No. 3 acknowledged that (1) "as of last Thursday" he was "a patient at the mental hygiene unit at the V.A. Hospital" and that he was taking trazodone prescribed for him there; (2) "in years past" he had had a "drinking problem," (3) he had recently kept a firearm for his brother, who was homeless, and (4) he lived in "a generally bad neighborhood." *Id*. at 47-49. Juror No. 3 then left the courtroom. After brief argument by defense counsel opposing dismissal, the judge announced: "I am going to exercise discretion under Rule 23(b), and I'm going to excuse Juror Number 3 from further participation." *Id*. at 50. The judge then brought Juror No. 3 into the courtroom and informed him he was dismissed. The remaining jurors were summoned and told that Juror No. 3 had

been excused "for primarily concerns . . . with respect to his health." *Id*. at 54. The judge then expressed the "hope" that the remaining 11 jurors would, "with a fair degree of alacrity, be able to reach a verdict." *Id*. at 54. The eleven remaining jurors resumed deliberating and returned verdicts against all of the defendants (but not on all of the counts) over a ten-day period from July 26 to August 15, 2001.

Each defendant filed a motion for mistrial based on the dismissal of Juror No. 3. The court denied the motions in an order filed August 16, 2001. The order states in part:

> Notwithstanding his expressed willingness to continue his service as juror, in light of his deceptive answers to *voir dire* questions the Court was unwilling to credit Juror No. 3's assurances that he was able to do so, and in conjunction with the testimony of the jury foreman and the female juror in whom Juror No. 3 had confided, the Court concluded that just cause existed to dismiss Juror No. 3.

*United States v. Hill*, Crim. Action No. 98-329, at 4 (D.D.C. filed Aug. 16, 2001) (8/16/01 Mem. & Order). In the order the court specifically found that Juror No. 3 had "given incorrect answers" on his voir dire questionnaire when he answered "in the negative" questions "about personal or familial alcohol abuse, mental health medications, firearm possession and neighborhood crime problems" because the juror had "in the past, abused alcohol," had "recently been in possession of a firearm," lived in a "crime-ridden neighborhood" and was "currently taking the anti-depressant medication for a mental condition that he shares with his brothers." *Id*. at 4, 3 & n.4; *see also* Joint Appendix 967-71 (Juror No. 3 questionnaire responses). The appellants offer six grounds for reversing the district court's decisions to dismiss Juror No. 3 and proceed with an 11-member jury under Rule 23. We address and reject each ground *seriatim*.

First, the appellants argue that the court failed to make an adequate inquiry into Juror No. 3's fitness to continue deliberating, noting specifically that, because the judge questioned Juror No. 3 in camera, there is no record evidence to support a finding of "just cause" to dismiss him. In pressing this challenge, the appellants rely on two decisions which we find distinguishable.

In *United States v. Patterson*, 26 F.3d 1127 (D.C. Cir. 1994), this court held that the district judge erred in dismissing a 68-year-old juror who had gone to the doctor after complaining of chest pains and had been absent for 2 ½ hours. There we concluded that the record revealed no just cause for the dismissal because the district judge "made no attempt to learn the precise circumstances or likely duration of the twelfth juror's absence." *Patterson*, 26 F.3d at 1129. In *United States v. Ginyard*, 444 F.3d 648 (D.C. Cir. 2006),[13] we found a similar lapse in the district court's juror investigation. The judge there dismissed the juror on the ground that his continued service the following week might jeopardize an employment opportunity available to him through a rehabilitation program. We concluded that "the district court's reasons for dismissing [the juror] rested on unexamined uncertainties about the extent of the juror's continuing availability" because it "was unclear whether [the juror] could be available the following week at all, for only a couple of days, or for a longer period of time." *Ginyard*, 444 F.3d at 654. Under the circumstances the district court "was obliged to make some further effort to resolve the uncertainty about the risk of loss of the holdout juror's job in order to find 'good cause' necessitated the juror's dismissal." *Id*. at 655. In contrast to these two cases, the district court here conducted an extensive examination of Juror No. 3's fitness. He questioned

---

[13] The appellants cited *Ginyard* in a letter submitted after oral argument pursuant to District of Columbia Circuit Rule 28(j).

Deputy Marshal Adams, Juror No. 1, Juror No. 17 and Juror No. 3. Although Juror No. 3's initial examination occurred off the record, the judge recited its content on the record at the hearing the following Tuesday. In the end, there were simply no factual "uncertainties" requiring additional inquiry.[14]

Second, the appellants claim that there is no basis for the court's "finding that Juror No. 3 was, in effect, mentally incapable of continuing to participate in the deliberative process," contending that such a finding requires more detailed evidence of a juror's mental condition than exists in this record. Br. of Appellants 35. The district court, however, did not dismiss Juror No. 3 based on mental incapacity. The court relied on a combination of factors—including that Juror No. 3 had lied about his symptoms before visiting the hospital, provided inaccurate voir dire responses about mental health treatment and was, according to Juror No. 1 and Juror No. 17, distracted and unfocused (and even threatening) during deliberations. These findings are amply supported by the evidence. *See* 8/16/01 Mem. & Order.

Third, the appellants claim that the trial judge improperly dismissed Juror No. 3 because he was impeding conviction. We reject this contention as well. It is true that the trial court "may not dismiss a juror during deliberations if the request for discharge stems from doubts the juror harbors about the sufficiency of the government's evidence." *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987). As a consequence, "if the record evidence discloses any possibility that the request

---

[14] It is immaterial that, as the appellants note, Br. of Appellants 34, the district judge made no finding of just cause to dismiss following his initial Thursday examination of Juror No. 3—the judge made fully supported findings after the subsequent dismissal based on information gleaned both from the initial examination and from later testimony by Adams and the three jurors.

to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request." *Id.* (citing *United States v. Essex*, 734 F.2d 832, 843 (D.C. Cir. 1984); *United States v. Stratton*, 779 F.2d 820, 832 (2d Cir. 1985), *cert. denied*, 476 U.S. 1162 (1986)). The evidence in this case supports no such inference notwithstanding the appellants' contention that "there is a probability—a reasonable likelihood—that Juror 3's dismissal for allegedly deceptive answers on his jury questionnaire was a pretext to obtain a quicker verdict." Br. of Appellants 44. The judge plainly stated his reasons for the dismissal and they had nothing to do with the juror's view of the case. The judge did not believe Juror No. 3 could "continue his service as juror" in light of "his deceptive answers to *voir dire* questions" and the testimony, described above, of Adams and the two jurors who were empaneled with him. 8/16/01 Mem. & Order at 4. There is no evidence the judge was motivated by Juror No. 3's "view of the sufficiency of the government's evidence." *Brown*, 823 F.2d at 596. The judge was scrupulous to counsel Jurors No. 1 and 17 not to reveal "how [they] may be split any way on the verdict" or "anything about [their] deliberations on the merits of the case or who may have voted what way," 7/24/01pm Tr. 10-11, and they did not. Nor is there any suggestion in the record that the judge had the least inkling of Juror No. 3's views regarding innocence or guilt. What the record shows is that Juror No. 3 was viewed by his fellow jurors as an obstacle to deliberations because he was "having problems staying focused." *Id.* at 12. In *Brown*, by contrast, we found that the record "indicate[d] a substantial possibility that [the dismissed juror] requested to be discharged because he believed that the evidence offered at trial was inadequate to support a conviction," based on his statements that "his difficulty was with 'the way [the law is] written *and* the way the evidence has been presented'" and that "'[i]f the evidence was presented in a fashion in which the law is written, then, maybe, [he] would be able to discharge [his] duties.'" 823

F.2d at 596-97 (emphasis by *Brown* court; alterations to last clause added).

Fourth, the appellants object to the court's finding that Juror No. 3's voir dire responses on the questionnaire were "deceptive." 8/16/01 Mem. & Order at 4. They argue first that the United States Supreme Court's decision in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556 (1984), "requires that there be a showing that the juror failed to answer honestly a material question arising during voir dire and that a correct response would have provided a valid basis for a challenge for cause." Br. of Appellants 46. The appellants' reliance on *McDonough Power Equipment* is misplaced. In that case the Supreme Court reversed a Tenth Circuit decision that ordered a new trial in a personal injury case because a juror gave a "mistaken, though honest response to a question" regarding injuries suffered by family members.[15] 464 U.S. at 555. The Court concluded that "to obtain a new trial" based on a juror's voir dire misstatement, a party must "show that a correct response would have provided a valid basis for a challenge for cause." *Id*. at 556. Here the judge did not rely on the voir dire misstatements as a basis for dismissal but only to explain, in part, why he did not credit Juror No. 3's assurance that he could continue to deliberate notwithstanding evidence to the contrary.

The appellants also assert the trial court's "deceptive" finding is unsupported but the record belies this claim. Adams's

---

[15] When asked whether he or "any members of [his] immediate family sustained any severe injury . . . whether it was an accident at home, or on the farm or at work that resulted in any disability or prolonged pain and suffering," 464 U.S. at 550 (ellipsis added), the juror neglected to mention an injury his son suffered in a truck explosion because he "apparently believed that his son's broken leg sustained as a result of an exploding tire was not such an injury," *id*. at 555.

testimony regarding his conversation with Juror No. 3 supports the judge's findings that, contrary to his voir dire responses, Juror No. 3 abused alcohol, handled a gun, lived in a dangerous neighborhood and had received mental health treatment. According to Adams, Juror No. 3 disclosed to Adams that he (1) "used to drink real bad," "really hit that bottle" and "had a problem" before he quit drinking 13 years earlier, 7/25/01am Tr. 15; (2) was "on trazodone," which is "used to treat depression," *id*. at 19-20; (3) "used to have a 'thing,'" meaning a .44 magnum revolver, *id*. at 16; and (4) had the revolver because he "lived in a real bad neighborhood, and he had been robbed at gunpoint," *id*. Further, the testimony of Juror No. 3 himself confirmed each of these facts. *See id*. at. 47-49.[16]

Fifth, the appellants argue summarily that, even if there was good cause to dismiss Juror No. 3, the court should have declared a mistrial rather than proceed with jury deliberations. We find no error in the judge's decision to continue. As we stated in *United States v. Harrington*, 108 F.3d 1460 (D.C. Cir. 1997): "Rule 23(b) explicitly and without reservation assigns the stop/go decision to the discretion of the trial court . . . ." 108 F.3d at 1472. Having already concluded the judge acted within his discretion in dismissing Juror No. 3 for cause, we perceive no abuse of discretion in his decision to continue with an 11-

---

[16] The appellants attack, in particular, the judge's determination that Juror No. 3 had misrepresented his use of mental health drugs, asserting he admitted to taking trazodone only since his visit to the V.A. Hospital the Thursday before he was dismissed. Juror No. 3, however, testified that the medication had "been prescribed for [him] by the mental hygiene unit," with no date specified, 7/25/01am Tr. 48, and Adams testified that security personnel at the V.A. Hospital knew Juror No. 3 by name and that he "learn[ed] from speaking with [them]" that Juror No. 3 was "someone who had visited that part of the hospital, the mental hygiene unit, on prior occasions as a patient," *id*. at 18.

member jury, especially given the trial's length and complexity. *See id*. (noting Advisory Committee notes to Rule 23 suggest if trial is "a relatively short and simple one . . . , a trial court 'might well' decide that a mistrial is appropriate, while for longer and more complex trials courts would be 'more likely' to decide against a mistrial" (quoting Fed. R. Crim. P. 23 Advisory Comm. note to 1983 amendments)).

Finally, the appellants assert that the judge's and Adams's *ex parte* contacts with the jurors violated the appellants' rights under the United States Constitution's Fifth Amendment Due Process Clause and Sixth Amendment's Confrontation Clause and under Federal Rule of Criminal Procedure 43. We reject this argument as well. We are inclined to agree with the government that these claims are governed by plain error review because, although defense counsel sought to examine the jurors further, they made no objection specifically based on the *ex parte* nature of the communications between the jurors and Adams and the judge. *See United States v. Yarborough*, 400 F.3d 17, 20 (D.C. Cir. 2005) (because defense counsel did not object to "judge's *ex parte* conversation with the deliberating jurors," "[p]lain error is . . . the standard of review" (citing *United States v. Lancaster*, 968 F.2d 1250, 1254 (D.C. Cir. 1992))). Nonetheless, even if defense counsel can be said to have properly objected, we find no reversible error. "'[T]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication.'" *United States v. Gagnon*, 470 U.S. 522, 526 (1983) (quoting *Rushen v. Spain*, 464 U.S. 114, 125-26 (1983) (Stevens, J., concurring in judgment)) (alteration in original). Counsel's presence is necessary only if required "to ensure fundamental fairness or a 'reasonably substantial . . . opportunity to defend against the charge.'" *Id*. at 527 (quoting

*Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934)). Because the *ex parte* conversations were unrelated to the merits of the case and their substance was reported in open court in the presence of the defendants and their counsel, they did not constitute error. In addition, even if the *ex parte* conversations with the judge were error, they were harmless and do not warrant reversal. *See United States v. Gordon*, 829 F.2d 119, 127 & n.9 (D.C. Cir. 1987) (violation of statutory and constitutional rights to be present during jury contact "subject to the harmless error analysis." (citations omitted)); *cf. United States v. McDonald*, 933 F2d 1519, 1525 (D.C. Cir. 1991) (*ex parte* communication between judge and juror not plain error where defense counsel made no objection and hearing was held at which trial court made full disclosure). This is particularly so as to Juror No. 3's conversations as his subsequent dismissal from the jury ensures that his *ex parte* contacts with the court did not taint the verdicts. *Cf. United States v. Doherty*, 867 F.2d 47, 72 (1st Cir. 1989) (judge's *ex parte* conversation with subsequently dismissed juror "could not have influenced the excused juror's further deliberations, for there were none; nor could it have influenced the remaining eleven jurors, because the excused juror had no further contact with them"); *United States v. Lustig*, 555 F.2d 737, 745-46 (9th Cir. 1977) (finding no prejudice from judge's *ex parte* interview with juror subsequently dismissed and replaced by alternate).

### III. Judicial Bias

The appellants also seek reversal of their convictions on the ground that the district court's conduct of the trial proceedings displayed what they characterize as "an extensive pattern of bias and lack of even-handedness that infected the entire nine-month proceeding" and that the judge's obvious bias prevented them from receiving a fair trial. Br. of Appellants 51. We disagree. "The threshold for a showing of bias is high," *United States v. Edmond*, 52 F.3d 1080, 1099 (D.C. Cir.) (per curiam), *cert.*

*denied*, 516 U.S. 998 (1995), and we do not believe the appellants have reached it because the conduct they cite does not "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994).[17] In asserting bias, the appellants identify three broad categories of conduct. We address each in turn.

First, the appellants object to discrete, allegedly biased rulings by the trial judge which (1) set the timing of disclosure of exculpatory material under *Brady v. Maryland*, 373 U.S. 83 (1963), and of witness statements to the government under the Jencks Act, 18 U.S.C. § 3500; (2) denied defense motions to strike jurors for cause; (3) overruled defense objections to hearsay and opinion testimony of government witnesses and excluded as hearsay testimony of a defense witness; and (4) limited the scope of defense cross-examination. But "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)). "Almost invariably, they are proper grounds for appeal, not for recusal." *Id*. "In and of themselves (*i.e.*, apart from surrounding comments or accompanying opinion), they . . . can only in the rarest circumstances evidence the degree of favoritism or antagonism required when no extrajudicial source is involved." *Id*. The isolated unfavorable rulings the appellants cite in the

---

[17] *Liteky* "was a statutory case, where the claim was that the trial judge should have recused himself." *United States v. Donato*, 99 F.3d 426, 434 (D.C. Cir. 1996). Here, as in *Donato* and the other two decisions from this circuit that we discuss below—*United States v. Edmond* and *United States v. Logan*, 998 F.2d 1025 (D.C. Cir.), *cert. denied*, 510 U.S. 1000 (1993)—the claim is not that the judge should have recused himself but that he displayed such bias that the appellants did not receive a fair trial. Nonetheless, the same general principles apply. *See, e.g.*, *Donato*, 99 F.3d at 435, *and Edmond*, 52 F.3d at 1101 (both invoking *Liteky*).

course of a trial proceeding lasting some nine months do not constitute such "rare circumstances." Nor does the fact that the judge may have ruled in favor of the government more often than he did in favor of the defense, as the appellants contend, by itself show bias. *See Edmond*, 52 F.3d at 1100 ("Appellants do not claim that a greater percentage of government requests than defense requests were granted, but even if that were the case such a disproportion would be insufficient by itself to establish bias." (citing *United States v. Pisani*, 773 F.2d 397, 402 (2d Cir. 1985) ("[A] trial judge must rule on countless objections, and a simple numerical tally of those sustained and overruled, one which here favors the government, is not enough to establish that the scales of justice were tipped against a defendant.")). The record here does not show that the judge did so disproportionately or unjustifiably.

Second, the appellants cite allegedly biased procedural decisions by the trial judge during both voir dire and trial. Initially, we note that the appellants have not appealed any of the individual procedures as error by itself but instead assert that cumulatively (and in conjunction with rulings and comments) they show impermissible bias. We do not agree.

The appellants object to a number of procedures the judge adopted during voir dire: empaneling an anonymous jury, having the United States Marshals Service transport jurors to the courthouse from undisclosed locations, moving the defendants to distant sites, refusing to permit the defendants to change from prison garb to civilian dress on the first day of jury selection and limiting defense counsel's interrogation of prospective jurors. Addressing the last first, "'the trial court retains great latitude in deciding what questions should be asked on voir dire'" and his "administration of this process 'is not easily subject to appellate review.'" *Edmond*, 52 F.3d at 1094-95 (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991)). We will not second-guess the judge's decision here to accelerate the jury selection process

by abbreviating questioning. As for the first three procedures, such precautionary steps to safeguard the jury are often taken in cases such as this involving allegations of racketeering, violence and, especially, witness or juror tampering. *Cf. Holbrook v. Flynn*, 475 U.S. 560, 570-71 (1986) (finding no significant prejudice in courtroom security force consisting of "four uniformed state troopers, two Deputy Sheriffs, and six Committing Squad officers"); *Edmond*, 52 F.3d at 1091 (upholding use of anonymous jury where defendants were "the primary participants in a large-scale criminal organization that distributed massive amounts of cocaine in Washington, D.C., and used violent acts to achieve its goals," "had the capacity to harm jurors" and "faced penalties that are among the harshest the law can impose" and the prosecution "attracted substantial pretrial publicity that the District Court understandably expected to continue throughout the trial");[18] *United States v. Darden*, 70 F.3d 1507, 1532-34 (8th Cir. 1995) (upholding anonymous jury, large number of security personnel in courtroom, two magnetometers at courtroom entrance, inspections of defense counsel's belongings, assembling jury in secret location, transporting jurors and defendants to and from courthouse in U.S. Marshal vans and using armed guards along street, convoy of police vehicles, helicopter surveillance and rooftop snipers). Further, the record indicates that each of the measures taken by

---

[18] In *Edmond*, the court stated that an anonymous jury is "warranted upon a showing of 'some combination' of five separate factors": (1) "the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment." 52 F.3d at 1091 (quoting *United States v. Ross*, 33 F.3d 1507, 1520 (11th Cir. 1994)).

the district court was motivated by legitimate safety concerns. *See* 9/27/00am Tr. 181-82 (anonymous jury necessary to protect jurors although court was "concerned" about its effect on jury); 11/13/00am Tr. 49 ("events since the last motions hearing" justified safety concerns generally and jury transport in particular); 11/17/00pm Tr. 19-21 (testimony of Deputy Marshal Adams that distant detention was necessitated by "security concerns" he was "not authorized to disclose"). Finally, we come to the judge's directive that the defendants were to remain in their prison attire if they wished to be present in the courtroom while the jurors completed their questionnaires on the first day of voir dire. *See* 11/15/00am Tr. 4. Although we discern no explanation for this requirement in the appellate record, we likewise find no indication it was motivated by bias.[19]

With regard to the trial itself, the appellants object in particular to restrictions the court imposed on defense counsel's use of testimony of government witnesses, such as limiting "collateral impeachment" (for bias, prejudice, motive, inconsistent statements, etc.) to one defense counsel per witness, 2/6/01am Tr. 4-5; permitting only one defense counsel to argue each objection at the bench, 2/14/01pm Tr. 17; and imposing short time limits on defense counsel's cross-examination of two witnesses, 1/22/01pm Tr. 48-49, 4/26/01am Tr. 34-35. "[A] district judge has wide discretion in monitoring the flow of a criminal trial." *United States v. Donato*, 99 F.3d 426, 434 (D.C. Cir. 1996). It is plain that the challenged restrictions (imposed,

---

[19] The appellants did not argue in their briefs that the attire requirement violated their constitutional right to due process, *see Estelle v. Williams*, 425 U.S. 501 (1976), although in arguing that the prison garb requirement manifested bias, they did cite to *Estelle* to support their assertion that "[t]he defendant's appearance in jail garb, it has long been recognized, can have a devastating effect on the jury," Br. of Appellants 58 & n.143.

in the main, outside the jury's presence) were attempts to exercise this discretion in order to conduct a lengthy, complex trial in an orderly, efficient manner, avoiding to the extent possible repetitious and irrelevant testimony. *See* 2/06/01am Tr. 5 (collateral impeachment rule designed to avoid repetition); 2/14/01pm 17 (regarding one-counsel-per-objection policy, explaining judge did not "want everybody up here at the bench" and if non-arguing counsel had something he wanted co-counsel "to impart," he should "whisper it in her ear or his ear"); 1/22/01pm Tr. 49 (regarding 10-minute limit for Martin's counsel, judge observed that witness ("the first witness of what is going to be a long trial") had given only "summary testimony" and "most of what [counsel was] interrogating about . . . has nothing to do with the scope of his direct examination"[20]); 4/26/01am Tr. 34, 35 (regarding 15-minute limit for Hill's counsel, judge noted counsel's cross-examination of hearsay witness related to what happened rather than what witness heard and was "delaying the proceeding with largely irrelevant and protracted examination"). While these attempts to control the trial may have seemed sharp and constraining at times, they do not manifest bias.

This brings us to the third alleged basis for finding bias: negative comments by the trial judge. As examples, the appellants point to a series of comments made during voir dire that, to them, manifested the judge's belief that defense counsel was attempting to disqualify qualified witnesses. *See, e.g.,* 11/29/00pm Tr. 37 (counsel's function is not "[t]o badger a prospective juror into giving answers that would disqualify her"); *id.* at 38 ("[S]ome counsel are seriously encroaching upon improper voir dire. I observe again, your function is not to

---

[20] In fact, the judge permitted Martin's counsel to continue cross-examination beyond the limit. *See* Br. of Appellants 77 n.208; 1/23/01am Tr. 5.

intimidate the prospective juror into giving an answer that you hope will operate to disqualify that juror."); 11/30/00pm Tr. 47 (characterizing counsel's question as "inappropriate"); 12/04/00am Tr. 73 (telling counsel he was "arguing with the juror"); 12/05/00pm Tr. 39 (counsel's questions "invite[d] [prospective juror] to take advantage of the possibility of being excused for this trial by demonstrating bias or prejudice"); 12/05/00pm Tr. 46-47 (telling counsel he was "trying to deliberately force a juror into disqualifying himself" and had "made it perfectly clear that [counsel] ha[d] no desire to have him here, even though he has indicated that he is perfectly capable of fulfilling his obligations as a juror"). While some of these utterances may have been "impolitic," as the appellants assert, they appear to reflect the judge's genuine (and not altogether groundless) perception that defense counsel was overzealous in questioning specific jurors whom they considered unfavorable to the defense case. As such, they were legitimate attempts to control defense counsel and prevent their abuse of voir dire, however they may have been perceived by defense counsel. Thus, they do not of themselves establish judicial bias. *See Donato*, 99 F.3d at 434 ("It is well within [the trial judge's] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior. Sharp words spoken by a trial court to counsel do not by themselves establish impermissible bias."). Nor do they do so in combination with judicial comments during the trial.

The appellants complain that the district court improperly "demeaned" and "threatened" defense counsel during trial when he cut them off and instructed them to be seated, *see, e.g.*, 2/01/01am Tr. 63; referred to (and admonished against) "frivolous" objections, *see, e.g.*, 1/24/01am Tr. 18, 2/5/01pm Tr. 60, 2/14/01pm Tr. 39; suggested they were attempting to delay the trial or cause a mistrial, *see, e.g.*, 2/5/01pm Tr. 58, 60; warned of possible contempt citations, *see, e.g.*, *id*. at 57-58; and

in fact cited two defense lawyers for contempt, 2/06/01am Tr. 90; 6/21/01am Tr. 29 (although he vacated the citations after the trial). The appellants argue that these remarks, taken together, reveal such bias on the part of the trial judge that they could not, and did not, receive a fair trial. Again, we disagree.

As the Supreme Court has observed*:*

> [J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. . . . *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky*, 510 U.S. at 555-56 (emphasis in original). The judge's comments during the trial did not reach a level of hostility that prevented a fair trial. Like those during voir dire, the trial comments reflect the judge's attempt to exercise his discretion to control the trial. That they may be critical or even harsh does not demonstrate reversible bias. *See Edmond*, 52 F.3d at 1101 ("Several supposedly hostile remarks (such as, for example, the judge's instruction to counsel that 'nobody is stopping you [from asking questions of a witness], as long as you do it properly') 'involved sustaining objections, denying of motions and ordering the rephrasing of questions to witnesses,' *United States v. Logan*, 998 F.2d 1025, 1029 (D.C. Cir.), *cert. denied*,

510 U.S. 1000 (1993), and were squarely within the District Court's discretion in controlling the conduct of the trial."); *id*. at 1102 ("[T]he judge's statement on three occasions that counsel was 'in contempt of court,' fall[s] within the judge's discretion to prevent improprieties during the trial and to 'rebuke counsel for improper behavior.'" (quoting *Logan*, 998 F.2d at 1029) (citations omitted)).

There are other reasons as well to reject the appellants' claims that the judge's comments reflected reversible bias. First, the cited utterances were aimed at defense counsel's conduct and not at the defendants themselves or at the merits of the case. *See id*. at 1101 ("'[R]eversal is not mandated where . . . rebukes of defense counsel reflected not upon the merits of the case but rather on the way it was being handled.'" (quoting *United States v. DiTommaso*, 817 F.2d 201, 220 (2d Cir. 1987)) (ellipsis in original). Second, most of the comments—including all of the references to contempt—were uttered outside the jury's hearing. *See id*. at 1102 ("We agree with the First and Second Circuits, that '[e]ven if unwarranted, a judge's reprimand of counsel furnishes no basis for reversal if made outside of the jury's presence.'" (quoting *DiTommaso*, 817 F.2d at 221; citing *Harris v. United States*, 367 F.2d 633, 636 (1st Cir. 1966), *cert. denied*, 386 U.S. 915 (1967)). Finally, the impact of these isolated remarks seems greatly reduced when viewed in relation to the length of the six-month long trial. *See id*. ("Even if one were to conclude—which we do not—that any of the challenged remarks were themselves prejudicial, the impact on the jury of such a small number of instances as are cited here would have been minimal or lost in the course of the lengthy trial." (citations omitted)). In these respects, the judge's remarks here differ significantly from the judicial comments we concluded required reversal in *United States v. Donato*.

In *Donato*, the court offered two bases to distinguish the judge's conduct there from what occurred in *United States v.*

*Edmond* and *United States v. Logan*, in which we rejected bias challenges. The same distinctions hold here. First, the court observed in *Donato* that the "negative comments" "were more concentrated, frequent, and critical than in either of those cases." 99 F.3d at 435. With regard to concentration, the court observed that the "relative brevity" of the two-week trial there "ma[de] it more likely that the judge's negative comments colored the entire trial" than they did in *Edmond*, in which the trial lasted three months, or *Logan*, in which the trial was "'long and arduous.'" *Id*. (quoting *Logan*, 998 F.2d at 1033). The proceeding here lasted some nine months, six of them consumed by the trial itself. To illustrate the frequent and negative nature of the judge's comments in *Donato*, the court quoted extensively from defense counsel's examination of two crucial witnesses—including the defendant—during which the trial judge uttered 65 negative remarks, 55 of them within the jury's hearing. The transcript of *this* trial shows no comparable frequency. Nor do the comments the appellants cite approach the belittling quality of the judge's remarks in *Donato*. *See Donato*, 99 F.3d at 435-37. Second, the *Donato* court distinguished *Edmond* and *Logan* on the ground that in each case "this court found it significant that the challenged remarks of the trial judge had been directed at the attorneys rather than at the defendants themselves," while in *Donato* the defendant herself came under heavy fire. *Id*. at 438 (citing *Edmond*, 52 F.3d at 1101; *Logan*, 998 F.2d at 1029). Here, as in *Logan* and *Edmond*, the negative comments the district judge uttered in the jury's presence were limited to counsel and did not extend to the defendants themselves.

In sum, considering the challenged rulings, procedures and comments together in the context of a long and difficult trial, we are not persuaded that "'the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to perfect, trial.'" *Logan*, 998 F.2d at 1029 (quoting *United States v. Pisani*, 773 F.2d 397, 402 (2d Cir. 1985)) (alteration in original); *see*

*Edmond*, 52 F.3d at 1099 ("A finding of judicial bias must be based on 'an abiding impression left from a reading of the entire record,' not from particular comments or rulings considered in isolation" (quoting *Offutt v. United States*, 348 U.S. 11, 12 (1954); citing *United States v. Twomey*, 806 F.2d 1136, 1140 (1st Cir. 1986)). Accordingly, we reject the appellants' allegation of reversible bias.

### IV. Confrontation Clause Challenges

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. CONST. amend. VI. Appellants Sweeney, Carson, and Coates contend that their rights under this clause were violated when the district court allowed Special Agent Vincent Lisi to testify about statements made by Robert "Butchie" Smith.

Before trial, the government moved to admit, through law enforcement officers and other witnesses, statements made by persons allegedly murdered by members of the K-Street organization. Among the statements were Smith's. Smith was a main target of the initial investigation into the Southwest organization in 1995. Law enforcement officers thought he was a major marijuana supplier in the area. During a June 1996 undercover operation, Special Agent Lisi and other officers filmed Smith selling drugs to a cooperating witness. The officers arrested Smith on December 5, 1996, took him to the FBI's offices, and showed him the video tape. Smith then waived his *Miranda* rights and expressed his willingness to talk with Special Agent Lisi about various crimes in the Southwest area.

Smith told Special Agent Lisi about his interactions with numerous conspiracy members and his conversations with Sweeney. He first detailed his drug sources and drug operation. Smith explained that he normally supplied marijuana to three individuals who in turn sold it on the street. He did this to

insulate himself from detection. Smith also sold marijuana directly to Coates, Hill, and Sweeney, among other conspiracy members. Smith described the murders and other violent crimes Sweeney and his associates committed. He then entered into a plea agreement with the government and was released a day after his arrest in order to give the impression that he was not a cooperating witness. He later returned to court and pled guilty to conspiracy to possess and distribute narcotics.

During his initial detention and then while acting as an informant for the government, Smith told Special Agent Lisi of the attempted murder of Michael Jones, the hunt for Kenny Adams, the kidnapping of Anthony Pryor, the murder of Donnell Whitfield, and the murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson. Smith said that he learned of these events and the details surrounding them from his conversations with Sweeney. In support of admitting Smith's and Sweeney's statements, the government adduced the following evidence.

While being detained by the Prince George's County, Maryland, Police Department for the triple murders of Gaskins, Mack, and Anderson, Sweeney began to suspect that Smith had divulged information to the authorities. Prince George's County Police Officers apparently aroused Sweeney's suspicions when they included in their statement of probable cause, filed at Sweeney's initial appearance, information about the triple murders, information attributed to a confidential FBI source. The probable-cause statement explained that Sweeney had told this informant about the murders and that only the investigators and perpetrators of the offense knew the information.

According to James Montgomery, whose testimony fills in the remaining details, Sweeney asked Carson and Montgomery to visit him while in jail. Montgomery did not go, but Carson visited Sweeney and reported his conversation to Montgomery. Carson asked Sweeney whom he told about the triple murders; Sweeney said that he told Smith about it and that Smith was

cooperating with the FBI.[21] Carson explained to Montgomery that without Smith the government would have no case against Sweeney for the triple murders.

In the following months, Carson and Montgomery planned and attempted several times to track down Smith and kill him. Montgomery and Carson looked for Smith whenever they happened to visit an area Smith frequented and would sometimes drive through those areas for the sole purpose of tracking him down. They spotted Smith several times in the open but could "do nothing to him in front of . . . everybody." On one occasion, Carson and Montgomery found Smith on Half Street, Southwest. They hurried to Carson's house, where Carson retrieved his sweat suit, gun, and gun belt, and then took a circuitous route back to Half Street. Carson ran up an alley to catch Smith from behind, while Montgomery waited in the car, but the tactic proved unsuccessful.

On June 16, 1997, while Montgomery was selling marijuana on Second Street, Carson approached Montgomery, took his car keys, and left in Montgomery's car. Some time later, Montgomery learned that Smith had been shot on Half Street. Montgomery then rode a bicycle to the corner of Half and O Streets. There he heard that Smith had been killed, which, according to Montgomery, came as a great relief, because he—like the other conspirators—was concerned that Smith was an informant. After learning of Smith's death, Montgomery rode back to Second Street, Southwest. Carson returned later that evening in Montgomery's car, parking it in an alley. As

---

[21] Other witnesses, who were incarcerated with Sweeney at the time, confirmed that he had identified Smith as an informant. Reginald Switzer, for example, overheard Sweeney say that he could not believe Smith was "snitching." And Sweeney told Charles Bender that Smith was "snitching" and that "family or not, he has got to get dealt with."

soon as Montgomery saw Carson, he said "you know them peoples got hit," to which Carson responded "yeah, I know. . . . [W]e're all right." Montgomery asked if Carson knew about whom he was talking. Carson said "trust me, we're all right," and gave Montgomery his keys back. Carson then instructed Montgomery to "stay from up Half Street" with his car "and not to drive it if [he] didn't have to." From a prior experience with Carson, Montgomery understood Carson's instruction to be a warning that someone might identify his car in relation to Smith's murder if Montgomery took the car near Half Street.

Relying on this evidence, most of which consisted of Montgomery's testimony, the government argued that the appellants forfeited their Sixth Amendment right to confront Smith. The Confrontation Clause secures a criminal defendant's right to confront witnesses against him through cross-examination. *See, e.g.*, *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974)); *Pointer v. Texas*, 380 U.S. 400, 404-05, 406-07 (1965) (collecting cases); *Mattox v. United States*, 156 U.S. 237, 244 (1895); *see also Crawford v. Washington*, 541 U.S. 36, 49, 53-54, 57 (2004). But a defendant forfeits this right when, through his misconduct, he causes the witness to be unavailable. *United States v. White*, 116 F.3d 903, 911 (D.C. Cir. 1997) (per curiam) (collecting cases). The government claimed that these defendants therefore forfeited their rights under the Confrontation Clause when their coconspirators murdered Smith, an act in furtherance of the conspiracy and reasonably foreseeable. It also claimed that Sweeney's statements to Smith were admissible as coconspirator statements in furtherance of the conspiracy.

The appellants objected on several grounds. They disputed whether a defendant could forfeit his confrontation rights based on misconduct committed by a coconspirator and whether there was a factual predicate for such forfeiture and for the

admissibility of Sweeney's statements to Smith. The district court overruled the objections, finding that "Smith was a co-conspirator and that the information imparted to Mr. Smith by Mr. Sweeney was in furtherance of that conspiracy." As a legal matter, the court agreed with the government that a defendant forfeits his right to confront a witness if his coconspirators caused the unavailability of that witness through misconduct and if their action was within the scope and in furtherance of the conspiracy, as well as reasonably foreseeable to conspirators. The court found that Sweeney "was directly involved in procuring the absence of . . . Smith as a witness by . . . inducing a co-conspirator to kill" him, and that "Carson's murder of Smith, either alone or in conjunction with others, made [Smith] unavailable as a witness for the government in this case." "[T]hese co-conspirators," the district court said, forfeited "their confrontation and hearsay objections to statements about acts in furtherance of, within the scope and reasonably foreseeable to all of them."

Sweeney, Carson, and Coates argue that the district court erred in concluding that a defendant may forfeit his rights under the Confrontation Clause and Federal Rule of Evidence 804(b)(6) when a coconspirator's misconduct causes a witness's absence. They also claim the court's predicate factual findings—that Carson or some other conspirator caused Smith's absence—were clearly erroneous. The district court was required to find the necessary facts by a preponderance of the evidence. *White*, 116 F.3d at 912. We review the court's legal conclusions regarding the Confrontation Clause and Rule 804(b)(6) de novo, *see United States v. Cherry*, 217 F.3d 811, 814 (10th Cir. 2000), and its factual findings for clear error, *White*, 116 F.3d at 911 n.2.

Although the Confrontation Clause secures important rights, those rights are not absolute. The rule has long been that defendants through misconduct may forfeit their right to

confront witnesses against them. *See Snyder v. Massachusetts*, 291 U.S. 97, 106 (1934), *abrogated on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964); *Diaz v. United States*, 223 U.S. 442, 452-53 (1912) (quoting *Reynolds v. United States*, 98 U.S. 145, 158 (1878)); *Reynolds*, 98 U.S. at 158-59; *see also Illinois v. Allen*, 397 U.S. 337, 343 (1970).[22] In *United States v. White*, we recognized that there is no more extreme "form of misconduct . . . than the murder of a potential witness" and held "that a defendant who wrongfully procures the absence of a witness or potential witness may not assert confrontation rights as to that witness." 116 F.3d at 911. This rule rests on "equity" and "the need for fit incentives." *Id.*; *see Crawford*, 541 U.S. at 62; *United States v. Thompson*, 286 F.3d 950, 962 (7th Cir. 2002) (collecting sources); *Steele v. Taylor*, 684 F.2d 1193, 1202 (6th Cir. 1982). A defendant should not be permitted to gain an evidentiary advantage through "threats, violence or murder." *White*, 116 F.3d at 911; *id.* at 912; *United States v. Mastrangelo*, 693 F.2d 269, 272-73 (2d Cir. 1982); *see also, e.g.*, *Cherry*, 217 F.3d at 815. Rule 804(b)(6) of the Federal Rules of Evidence also excepts from inadmissible hearsay those statements "offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." This rule is necessary, according to the advisory committee notes, in order "to deal with abhorrent behavior 'which strikes at the heart of the system of justice itself.'" Fed. R. Evid. 804(b)(6) advisory committee's note (quoting *Mastrangelo*, 693 F.2d at 273).

Appellants do not dispute any of this. Their quarrel is with allowing the misconduct of a coconspirator to cause the

---

[22] That Smith's statements were to Special Agent Lisi, and therefore likely testimonial, is of no moment. *See Crawford*, 541 U.S. at 68. The Supreme Court in *Crawford* approved the forfeiture-by-misconduct exception even when out-of-court statements are testimonial. *See id.* at 62.

forfeiture of a defendant's right—a subject we address in a moment—and with the district court's underlying factual findings. As to the facts, the district court found that Carson murdered Smith, "either alone or in conjunction with others," and that this "made [Smith] unavailable as a witness for the government." Ample evidence supported this finding. Montgomery testified at length about his and Carson's activities leading up to Smith's murder; their motive for killing Smith; their ongoing hunt for him; their failed opportunities; Carson's use of Montgomery's car just before Smith's murder; Carson's return after the murder; his acknowledgment of Smith's murder and his assurance that they were "all right"; his instruction to Montgomery not to drive near the murder scene; and Montgomery's understanding that Carson meant that, if he did drive near the scene, observers might identify the car in relation to the murder. The appellants insist that because the government offered no eyewitness to Smith's murder, Montgomery's testimony was inherently suspect. But no rule of law required the government to produce an eyewitness, assuming there was one despite Montgomery's and Carson's desire to eliminate Smith without anyone watching. The district court evaluated Montgomery's credibility and credited his testimony, and there is no basis for our disturbing the court's judgment. *See United States v. Scriber*, 499 F.2d 1041, 1044 & n.12 (D.C. Cir. 1974); *see also United States v. Lewis*, 693 F.2d 189, 193 (D.C. Cir. 1982). It follows that there was a factual predicate to forfeiture and that Carson has forfeited any rights he may have had. *See White*, 116 F.3d at 911; *see also* Fed. R. Evid. 804(b)(6).

Sweeney and Coates—not Carson, of course—argue that a defendant's forfeiture, either under the Confrontation Clause or Rule 804(b)(6), cannot result from a coconspirator's causing a witness to be absent from trial. Yet the reasons why a defendant forfeits his confrontation rights apply with equal force to a defendant whose coconspirators render the witness unavailable,

so long as their misconduct was within the scope of the conspiracy and reasonably foreseeable to the defendant, as it was here.[23] Suppose several individuals enter into a conspiracy, and, as part of the conspiracy, they agree to kill all potential witnesses against them. All members of the conspiracy would be criminally responsible for the resulting murder of a witness, *see Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946), and there is no good reason why the murder should give any of them an evidentiary advantage, *see Blumenthal v. United States*, 332 U.S. 539, 557 (1947); 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 12.2(a), at 267 (2d ed. 2003). That there is no direct evidence of an explicit agreement to kill adverse witnesses in this case is of no moment. The evidence was more than sufficient to infer the existence of such an agreement and to conclude that Smith's murder was in furtherance of the conspiracy and reasonably foreseeable. *See Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 221 (1939); *United States v. Childress*, 58 F.3d 693, 715 (D.C. Cir. 1995) (per curiam).[24]

---

[23] Sweeney told several people, while he was in jail, that Smith was "snitching" and that "family or not, he has got to get dealt with." Montgomery testified that while in jail Sweeney asked Carson and him to visit and that after this visit Carson stated that without Smith the government would have no case against Sweeney. Carson also related his conversation with Sweeney about Smith being the likely informant. Carson and Montgomery immediately formulated a plan to kill Smith. Montgomery also testified that the other conspirators worried, as did he, that Smith was an informant for the police. And the government adduced considerable evidence that members of the conspiracy, including Sweeney and Coates, regularly murdered or attempted to kill witnesses or informants who could testify against them.

[24] Our conclusion is consistent with the rulings of other circuits. *See Thompson*, 286 F.3d at 963-65; *Cherry*, 217 F.3d at 818. It is also

Carson and Coates have additional arguments. They say that if Smith had been alive, he would not have been permitted to testify about the statements Sweeney made to him and that the district court therefore erred in allowing Smith's statements (concerning Sweeney's) to come in against them through Special Agent Lisi. Their theory is that Smith was not a coconspirator and that, even if he were, Sweeney's statements to him were not in furtherance of the conspiracy. As they see it, admitting the statements Sweeney made to Smith violated the Sixth Amendment rule set down in *Bruton v. United States*, 391 U.S. 123 (1968), that a co-defendant's out-of-court statements implicating other defendants are inadmissible when there is no opportunity to cross-examine the co-defendant.

Statements satisfying the coconspirator non-hearsay rule under Federal Rule of Evidence 801(d)(2)(E) may be admitted against co-defendants without violating the Confrontation Clause. *See Bourjaily v. United States*, 483 U.S. 171, 182-84 (1987);[25] *United States v. Mickelson*, 378 F.3d 810, 819 (8th Cir.

---

generally consistent with decisions that have not addressed this issue directly, but nonetheless recognized that forfeiture by misconduct may be imputed to a defendant. *See, e.g.*, *United States v. Rivera*, 412 F.3d 562, 567 (4th Cir. 2005) (discussing Rule 804(b)(6)); *Mastrangelo*, 693 F.2d at 273-74, *cited approvingly in* Fed. R. Evid. 804(b)(6) advisory committee's note; *Olson v. Green*, 668 F.2d 421, 429 (8th Cir. 1982) (recognizing that "someone acting on a [defendant's] behalf may waive or forfeit that [defendant's] right").

[25]*Bourjaily* relied on *Ohio v. Roberts*, 448 U.S. 56 (1980), to reach its conclusion. *See* 483 U.S. at 182-83. The Supreme Court, disapproving of the reasoning in *Roberts*, recently held that to admit testimonial hearsay, the declarant must be unavailable and there must have been a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 62-69. *Crawford* does not undermine *Bourjaily*. Coconspirator statements in furtherance of a conspiracy are not typically the type that fall within the definition of "testimonial." The

2004); *United States v. Shores*, 33 F.3d 438, 442 (4th Cir. 1994); *United States v. DeVillio*, 983 F.2d 1185, 1193-94 (2d Cir. 1993). "[A] statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay under Rule 801(d)(2)(E). To admit such statements, the district court must find by a preponderance of the evidence that "there was a conspiracy involving the declarant and the nonoffering party, and that the statement[s were] made 'during the course and in furtherance of the conspiracy.'" *Bourjaily*, 483 U.S. at 175 (quoting Fed. R. Evid. 801(d)(2)(E)); *id.* at 176; *United States v. Gatling*, 96 F.3d 1511, 1520 (D.C. Cir. 1996). We review the district court's factual findings for clear error. *Gatling*, 96 F.3d at 1521 (citing *United States v. Edmond*, 52 F.3d 1080, 1110 (D.C. Cir. 1995) (per curiam)).

The district court concluded that Smith was a coconspirator with Sweeney, Carson, and Coates and that Sweeney's statements to him were made during the course of and in furtherance of the conspiracy.[26] Rule 801(d)(2)(E) requires that the declarant be in a conspiracy with those against whom the statements are offered. Fed. R. Evid. 801(d)(2)(E); *see, e.g.*, *Bourjaily*, 483 U.S. at 175; *Gatling*, 96 F.3d at 1520. The evidence was overwhelming that Sweeney, Carson, and Coates were coconspirators, and the jury so found. Smith's status as a coconspirator, while not essential to admissibility, is nevertheless relevant to whether Sweeney's statements were made during the course of and in furtherance of the conspiracy, as the rule also requires.

---

*Crawford* Court recognized as much. *Id.* at 56.

[26] It was unnecessary to conclude that Smith was a coconspirator in order to admit Sweeney's statements. *See Bourjaily*, 483 U.S. at 175; *Gatling*, 96 F.3d at 1520; *United States v. Beckham*, 968 F.2d 47, 51 n.2 (D.C. Cir. 1992).

Carson and Coates acknowledge that Smith sold drugs to members of the conspiracy, including Reginald Switzer, Arthur Rice, Eric Jones, Vincent Hill, Paul Taylor, Sean Coates, Gary Price, and William Sweeney. They contend, however, that Smith's real drug "operation" involved selling drugs to three individuals[27] not connected to the conspiracy who resold the narcotics in Southwest Washington, D.C., and that this sporadic "buyer/seller relationship with some of the defendants" did not make him a coconspirator. Br. of Appellants 104-05. While the evidence may not have shown that Smith was a principal member of the conspiracy or that he had a relationship with every conspiracy member, neither is required to make him a coconspirator. *See Childress*, 58 F.3d at 709-10; *United States v. Tarantino*, 846 F.2d 1384, 1392-93 (D.C. Cir. 1988) (per curiam). Smith had only to agree to enter and "knowingly participate[] in the conspiracy with the intent to commit the offense"—in this case distribution and possession of narcotics. *Gatling*, 96 F.3d at 1518; *Childress*, 58 F.3d at 707-08. His status as a conspirator may "be inferred from circumstantial evidence," *Gatling*, 96 F.3d at 1518, especially from his "knowing participation in a distribution network," *Childress*, 58 F.3d at 710. The district court did not clearly err in drawing such an inference here.

Smith explained to Special Agent Lisi that although he dealt primarily with three individuals in an attempt to insulate himself from exposure, "there were people that he did deal with personally, some people that he knew." He directly distributed marijuana to Sweeney, Coates, and Hill, among other members of the conspiracy. Montgomery said that he believed Smith was "supplying marijuana to [K Street] Southwest." As an example, he discussed an occasion in which Eric Jones, an acknowledged

---

[27] Carson and Coates state that Smith sold drugs to four individuals. Special Agent Lisi identified only three.

coconspirator, intended to purchase ten pounds of marijuana from Smith. Although Montgomery was not sure whether Jones actually obtained that amount from Smith, the fact that Smith sold drugs to conspiracy members—and that he was always an available source to them—was supported by Arthur Rice, another coconspirator. Rice explained that, while Smith may not have been a major "supplier," members of the conspiracy "could go to him and get stuff . . . . I mean he had a lot of it. He could get his hands on a lot of it." Rice said that Smith had supplied or helped him obtain drugs "[m]ore than once." On one occasion, Smith gave Rice marijuana to help him get reestablished in the marijuana business after being released from jail. Smith helped out coconspirators in other ways. While Sweeney and Rice were in jail together, Smith sent both of them money orders. He also helped pay for Rice's legal representation when Rice was arrested for the murder of a rival gang member. *See Tarantino*, 846 F.2d at 1397 ("[N]ot . . . every act taken in furtherance of the conspiracy [need be] illegal."). It was not clearly erroneous for the district court to conclude that Smith "knew of the nature and scope of the conspiracy, joined in its aims, and facilitated its success." *Id.* at 1396.

*United States v. Morris*, 836 F.2d 1371 (D.C. Cir. 1988), does not, as Carson and Coates insist, command a different result. *Morris* merely states the quite unremarkable proposition "that a buyer-seller relationship" consisting of a couple drug transactions "does not make out a conspiracy." *Id.* at 1374. But the evidence here is on a different plane altogether. Rice explained that conspiracy members could go to Smith as they needed and that Rice in fact had done so "[m]ore than once." It is also clear that Smith had an ongoing relationship with conspiracy members, assisting them and supplying them with drugs as the occasion arose. Smith may not have been a principal conspiracy member, but he was a coconspirator nonetheless.

We now turn to Carson and Coates's claim that Sweeney's statements to Smith were not made "during the course and in furtherance of the conspiracy" and, for that reason, are inadmissible under Rule 801(d)(2)(E). Sweeney's statements to Smith about various crimes committed by conspiracy members did not further the conspiracy, the argument goes, because they consisted of "idle chatter," bragging, or mere narratives of past events. The appellants are correct, as a general matter, that statements of that sort are usually not "in furtherance" of a conspiracy. *See Tarantino*, 846 F.2d at 1411-12; *see also Edmond*, 52 F.3d at 1111. But if the statements "'can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy,'" then the statements further the conspiracy and are admissible. *Edmond*, 52 F.3d at 1110-11 (quoting *Tarantino*, 846 F.2d at 1412); *accord United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). Such statements include those that keep a coconspirator updated "on the status of the business," motivate a coconspirator's "continued participation," *Tarantino*, 846 F.2d at 1412; *see also Rivera*, 22 F.3d at 436, or provide background information on key conspiracy members, *Edmond*, 52 F.3d at 1111 (quoting *Tarantino*, 846 F.2d at 1413); *United States v. Walls*, 70 F.3d 1323, 1327 (D.C. Cir. 1995).

Sweeney's statements to Smith described various kidnappings, murders, attempts to intimidate witnesses, and other acts of violence committed by conspiracy members. What Sweeney said was not, as these appellants assert, mere narrative or idle chatter. He was updating Smith on the conspiracy's status, motivating his continued participation, and providing him with background information. For example, Sweeney discussed with Smith the shootings or attempted shootings of Michael Jones and Kenny Adams. Both Jones and Adams were going to testify against members of the conspiracy, and Sweeney detailed the conspiracy members' attempts to silence them. Though

describing events that had transpired, this information could have served several functions: to update Smith on eliminated threats—that is, to give the "all clear"; to remind Smith to keep an ear open for more threats; to encourage him to weed out other witnesses against them; and to make sure Smith did not consider turning against the conspiracy (that is, to motivate his continued participation). All of this served to further the conspiracy's goals of selling drugs and evading capture. Other statements advanced the conspiracy in another way. Sweeney's descriptions of Anthony Pryor's kidnaping and the triple murders of Gaskins, Mack, and Anderson updated Smith on the status of conspiracy members. With an understanding of what conspiracy members faced, Smith could help protect those members from law enforcement or other dangers. By protecting the various components of the conspiracy, Smith naturally would be advancing the conspiracy.

Because the district court properly found that Sweeney's statements were in furtherance of the conspiracy, the statements were non-hearsay coconspirator statements, admissible under Rule 801(d)(2)(E) without violating the Confrontation Clause.

## V. Convictions under 18 U.S.C. § 1959

All five appellants attack their convictions for violating 18 U.S.C. § 1959, the statute prohibiting violent crimes in aid of racketeering activity. They contend that § 1959 is facially unconstitutional because it exceeds Congress's Commerce Clause authority. Carson and Coates alternatively argue that even if the statute is constitutional, the evidence at trial was insufficient to convict them of violating it.

As relevant here, § 1959 prohibits any person from "murder[ing], kidnap[ping]," or committing any other "crime of violence" in exchange for "anything of pecuniary value from an enterprise engaged in racketeering activity" or to "gain[] entrance to or maintain[] or increas[e] position" in such an

enterprise. *Id.* § 1959(a). "'[R]acketeering activity'" is defined as it is in the RICO statute, *id.* § 1959(b)(1); *see id.* § 1961, and "'enterprise'" is defined to include any "legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce," *id.* § 1959(b)(2).

Each defendant was indicted for violating § 1959 by committing various violent crimes in furtherance of the RICO conspiracy charged in Count 2.[28] Carson, Coates, and Sweeney were each convicted on three counts of violating § 1959 for their roles in the triple murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson. Carson was also convicted of violating this section for the attempted murder of Ulysses English and the murder of Chrishauna Gladden. Coates and Sweeney were each convicted under § 1959 for the attempted murder of Anthony Pryor. Coates was also convicted for the attempted murder of Ronald Sowells, and Sweeney for the murder of Donnell Whitfield. Martin was convicted for the attempted murder of James Coulter in aid of racketeering.

Relying on *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), the appellants claim that the statute facially exceeds Congress's Commerce Clause authority because § 1959 does not regulate commercial activity and does not contain a jurisdictional provision requiring that the prohibited conduct have a connection to interstate commerce.

---

[28] Although Hill apparently challenges the constitutionality of § 1959, it does not appear that the jury found him guilty of violating that section. He was indicted under § 1959 for the attempted murders of Anthony Pryor, Kimberly Richardson, and Reggie Jones in aid of racketeering activity. Only the attempted murder of Anthony Pryor was submitted to the jury, and it found him not guilty.

The government correctly points out that the appellant did not raise this argument below. "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). This applies to constitutional and nonconstitutional challenges alike. *See, e.g.*, *Piersall v. Winter*, 435 F.3d 319, 325 (D.C. Cir. 2006); *Manion v. Am. Airlines, Inc.*, 395 F.3d 428, 432 (D.C. Cir. 2004); *United States v. Baylor*, 97 F.3d 542, 543 n.1 (D.C. Cir. 1996); *United States v. Badru*, 97 F.3d 1471, 1476 (D.C. Cir. 1996).

In any event, it is impossible to see how a statute regulating conduct within the District of Columbia could exceed congressional authority under the Commerce Clause. As in the U.S. Territories, Congress has plenary authority in the District of Columbia. *See* U.S. CONST. art. I, § 8, cl. 17; U.S. CONST. art. IV, § 3, cl. 2; *see also, e.g.*, *Binns v. United States*, 194 U.S. 486, 491 (1904). Within the District, Congress did not need to rely on its Commerce Clause authority. Even if there were some doubt about § 1959's constitutionality outside the District of Columbia, "we need not find the language of [§ 1959] constitutional in all its possible applications in order to uphold its facial constitutionality." *Griffin v. Breckenridge*, 403 U.S. 88, 104 (1971).[29]

Carson and Coates attack some of their § 1959 convictions for insufficient evidence. We review sufficiency-of-the-evidence challenges "in the light most favorable to the government, drawing no distinction between direct and

---

[29] Section 1959(b)(2) defines "enterprise" in terms of the group's effect on interstate commerce. But the appellants do not claim that the K-Street gang had no such effect. Their argument is instead that § 1959 exceeds Congress's Commerce Clause authority because the provision does not require that each act of violence affect interstate commerce.

circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005) (quoting *United States v. Foster*, 783 F.2d 1087, 1088 (D.C. Cir. 1986)) (internal quotation mark omitted). If "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" the conviction must be affirmed. *Id.* (quoting *United States v. Arrington*, 309 F.3d 40, 48 (D.C. Cir. 2002)).

Section 1959 requires a jury to find two elements in addition to the violent criminal activity. The first is "an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). The second is that a defendant committed the violent crime with one of three motives: (1) "as consideration for . . . anything of pecuniary value" from such an enterprise, (2) "as consideration for a promise . . . to pay" something of value from such an enterprise, or (3) "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." *Id.* This third element—the only one at issue here—may be shown if "the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992); *accord United States v. Tse*, 135 F.3d 200, 206 (1st Cir. 1998); *United States v. Fiel*, 35 F.3d 997, 1004 (4th Cir. 1994). Carson and Coates do not contest the jury's finding that the K-Street enterprise was one engaged in racketeering activity.[30] Instead, they contend that there was

---

[30] "'[R]acketeering activity'" is defined by reference to 18 U.S.C. § 1961. *Id.* § 1959(b)(1). That statute defines such activity to include "dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law." 18 U.S.C. § 1961(1)(A). The enterprise here regularly engaged in, among other things, the sale of marijuana, a

insufficient evidence that their violent crimes were done in order to maintain or increase their positions in that enterprise.

The subject of Carson's claim is his § 1959 conviction for the shooting of Ulysses English.  On the morning of June 26, 1994, several people witnessed Carson shoot English while English sold drugs on K Street.  English apparently associated with the 58th-Street crew, a rival of the K-Street organization. Before English's shooting, Carson informed Montgomery that he "was almost certain that [English] had told Keith Holmes" and other people from 58th Street, Southeast, "where [Carson's] mother live[d]."  At trial Montgomery explained the significance of this:  gang members generally kept this type of information secret to protect themselves and their families from rivals.  The fact that people from 58th Street knew this information concerned both Carson and Montgomery, who worried that something might happen to Carson or his family.  Carson told Montgomery to keep an eye out for English and to "hit him" if he saw "him in a good position."  On the day English was shot, Carson approached Montgomery, who was selling marijuana, and told him that "something was about to happen."  Not long after this, at least two people saw Carson shoot English and run off.

Carson argues that the shooting of English was done out of concern for Carson's safety, that it was "unrelated to possession with intent to distribute or distribution of drugs," and that it was therefore not done to maintain or increase his position in the enterprise.  Br. of Appellants 128.  Viewed in the light most favorable to the government, the evidence proved that English was a member of a rival organization battling the K-Street enterprise and that English had potentially put Carson and his

controlled substance.  *See, e.g.*, *United States v. Feliciano*, 223 F.3d 102, 119 (2d Cir. 2000) (quoting, *inter alia*, *United States v. Goodwin*, 141 F.3d 394, 399 (2d Cir. 1997)).

family in danger. Threatened by a rival gang member, Carson took the action that "was expected of him by reason of his membership." *Concepcion*, 983 F.2d at 381. It follows that a reasonable jury could have inferred that Carson shot English to maintain his position in the K-Street organization. This conclusion gains more support from evidence that the K-Street organization intimidated, threatened, or killed people or groups who threatened it or its members. Carson's shooting of English could have been "in part at least in furtherance of the enterprise's policy of treating affronts to any of its members as affronts to all, of reacting violently to them and of thereby furthering the reputation for violence essential to maintenance of the enterprise's place in the drug-trafficking business." *United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996). The jury also could have determined that Carson shot English to maintain or increase his own reputation as an enforcer in the enterprise. The evidence showed that Carson frequently carried out violent crimes against those who threatened the organization or its members.

The subject of Coates's claim is the triple murders of Gaskins, Mack, and Anderson. The murders resulted from a robbery that went sour. After Carson and Sweeney saw Gaskins win $50,000 in Las Vegas, Carson, Sweeney, and Montgomery discussed robbing Gaskins of his winnings and using the money to purchase guns to aid them in their dispute with members of a rival gang and to supplement the slow-down in marijuana sales. Gaskins had returned to his home in Temple Hills, Maryland. Carson, Sweeney, and Montgomery approached the house to commit the robbery, but did not see Gaskins's car and did not know whether he was inside. In light of this, they decided to pick up Coates, who knew Gaskins, gambled at his house on occasion, and could enter the house to ensure that Gaskins was there. When they returned to Gaskins's house with Coates, they saw Gaskins and Mack leave with two women. The four defendants left for Montgomery's mother's house, made masks

to cover their faces, stole a license plate to put on the rental van they were using, and returned to Gaskins's house. Gaskins arrived with Mack and the two women. The four appellants circled around to the back of the house and parked the van in the parking lot. Montgomery and Sweeney jumped out of the van and rushed up to Gaskins's place. Coates, who was unarmed, remained in the van. As Gaskins, Mack, and the two women entered the house, Sweeney, with a gun, and Montgomery, with a stun gun, rushed in, pushing everyone inside except Anderson (one of the women), who remained outside. Gaskins reached for something and Sweeney shot him. Sweeney then shot Mack and fled the house, shooting Anderson on his way out.

Like Carson, Coates contends that there was insufficient evidence that his involvement in the triple murders was for the purpose of maintaining or increasing his position in the enterprise. He argues that he did not know of, or share in, the other appellants' plan to rob Gaskins in order to buy weapons for the enterprise or to make up for the organization's lagging marijuana sales. Nor was the robbery connected to the organization's "core business of drug dealing," according to Coates. Br. of Appellants 130. None of these assertions change the fact that Coates was involved in the triple murders in order to maintain or increase his position in the K-Street enterprise. Although the attempted robbery was unlike their other drug activities, Sweeney, Carson, and Montgomery planned to rob Gaskins in order to supply the enterprise with arms and supplement the enterprise's income. Coates joined Sweeney, Carson, and Montgomery "because he knew it was expected of him by reason of his membership in the enterprise." *Concepcion*, 983 F.2d at 381. The jury could fairly infer from Coates's willingness to assist his coconspirators that he joined them because this was expected of him. It makes no difference whether Coates shared Sweeney, Carson, and Montgomery's motive or whether his interest in maintaining his position was his sole motivation, *see id.*; *see also Tse*, 135 F.3d at 206.

*United States v. Thai*, 29 F.3d 785 (2d Cir. 1994), does not, as Coates urges, dictate a different result. There the Second Circuit held that the leader of a gang who bombed a restaurant did not act in furtherance of the gang's enterprise or attempt to maintain his status through the bombing. *Id.* at 818-19. Although the gang engaged in murder, robbery, and extortion, the gang leader bombed the restaurant as part of a side agreement unrelated to the enterprise. *Id.* at 818. Here the attempted robbery of Gaskins was not the K-Street enterprise's typical business, but it was done to further the ends of the enterprise. A rational jury could properly find that Coates accompanied his coconspirators in an effort to maintain his position in the enterprise—that is, because the other members expected him to assist them. The other cases Carson and Coates cite are inapposite because each involved individuals who were not members of the charged enterprise. *See, e.g.*, *United States v. Ferguson*, 246 F.3d 129, 135-36 (2d Cir. 2001); *United States v. Polanco*, 145 F.3d 536, 540 (2d Cir. 1998).

## VI. Joinder

Carson and Martin claim that several first-degree murder charges under D.C. Code § 22-2401 (1996) and various criminal charges related to events that occurred on, or in connection with, 37th Street, Southeast, were misjoined with the broader narcotics and RICO conspiracy charges. They contend that the prosecution failed to prove a sufficient relationship between these joined charges and the broader claims asserted in the indictment.

The superseding indictment filed on March 25, 1999,[31]

---

[31] This was the indictment before the court when the defendants moved to sever. Thereafter a retyped indictment was filed on January 4, 2001, and a second retyped indictment was filed on July 2, 2001. The charges of which Carson and Martin complain were alleged in each version. The verdicts relate to the July 2 indictment.

contained 101 counts. Among these were charges against Carson and Martin for first-degree murder in violation of D.C. Code § 22-2401 (1996). The charges related to Carson's alleged murder of Maurice Hallman, Leonard Hyson, Teresa Thomas, and Terita Lucas, and Carson and Martin's murder of Anthony Fortune. Carson participated in the murder of Hallman and Hyson, according to the government, as retaliation for an attack on a member of the K-Street organization. The government alleged that Carson murdered Thomas and Lucas because they gave a rival drug dealer a bag of guns Carson had stored at Thomas's apartment. And according to the government, Carson and Martin killed Anthony Fortune, who had robbed Martin, to protect the organization's violent reputation and ward off future affronts to it or its members. Fortune's murder was particularly important because the organization was trying to move into his area.

The indictment also charged Carson and Martin with various racketeering acts underlying the RICO conspiracy charged in Count 2. These racketeering acts included murdering Anthony Fortune and Curtis Edward and assaulting with intent to murder Keith Bradley, Jimmy Thomas, Richard Burton, Keith Jones, and Officers Adrian Treadwell, Edward McDonald, Marc Little, and Alvin Ray. All of these counts arose out of events on 37th Street, which, as the government alleged, became an extension of the K-Street organization when some conspirators moved there. Carson and Martin's murder of Fortune begat a rivalry between the K-Street organization and a gang from 58th Street, leading to numerous drive-by shootings. This in turn led, on one occasion, to a shoot-out between Carson, Martin and police officers, and, on another occasion, to Martin firing into Edwards's car (in which Burton and Jones were riding) on the mistaken belief that Edwards was part of the 58th-Street gang. Related to the shoot-out with police was the charge against Martin for assaulting, resisting, and interfering with a police

officer while using a dangerous weapon. *See* D.C. Code § 22-505(b) (1996).

Carson and Martin filed a pretrial motion to sever these counts under Federal Rule of Criminal Procedure 14, contending among other things that the counts were misjoined under Rule 8 with the other counts, particularly the narcotics and RICO conspiracy counts. Carson and Martin argued, as they do on appeal, that the D.C. Code offenses and the charges related to 37th Street were distinct and unrelated to the alleged RICO and narcotics conspiracies. The district court denied the motion. The jury returned guilty verdicts on the first-degree murder counts and on the single count of assaulting, resisting, and interfering with a police officer. It also found the racketeering acts proven.

Carson and Martin's Rule 8 argument here differs from their pretrial argument in a material respect: rather than arguing that the counts, as alleged, were misjoined as a legal matter, they contend that joinder was inappropriate because the evidence at trial failed to prove a sufficient connection between these counts and the broader narcotics and RICO conspiracy counts to satisfy the standards of Rule 8. This change in their argument is important because Rule 8 governs only the initial joinder of counts and defendants: "the only issue under Rule 8 is whether joinder was proper at the beginning of trial." *United States v. Clarke*, 24 F.3d 257, 262 (D.C. Cir. 1994) (discussing *Schaffer v. United States*, 362 U.S. 511, 514 (1960)); *see also United States v. Irizarry*, 341 F.3d 273, 287 (3d Cir. 2003); *United States v. Friedman*, 854 F.2d 535, 561 (2d Cir. 1988). The propriety of joinder is determined as a legal matter by evaluating only the "indictment [and] any other pretrial evidence offered by the Government." *United States v. Spriggs*, 102 F.3d 1245, 1255 (D.C. Cir. 1996) (quoting *United States v. Wilson*, 26 F.3d 142, 153 (D.C. Cir. 1994)) (internal quotation mark omitted); *see also Schaffer*, 362 U.S. at 513; *United States v. Halliman*,

923 F.2d 873, 883 (D.C. Cir. 1991).[32] After counts are joined, "subsequent severance [is] controlled by Rule 14." *Schaffer*, 362 U.S. at 515. Whereas misjoinder under Rule 8 is determined according to the propriety of joining offenses before trial, severance may be warranted under Rule 14 "at all stages of trial" because the district court has a "continuing duty" to sever counts if it finds a risk of prejudice. *Id*. at 516; *see also Zafiro v. United States*, 506 U.S. 534, 539 (1993). That Rule 8 and Rule 14 operate differently is made clear by the standards governing appellate review of a district court's decision under them. Judge Friendly explained:

> The question[s] of the propriety of joinder under Rule 8 and of refusal to grant relief from prejudicial joinder under Rule 14 are quite different in nature . . . . The former is a question of law, subject to full appellate review . . . . In contrast, the grant of relief under Rule 14 lies within the discretion of the trial judge and refusal to sever counts . . . properly joined under Rule 8 will be reversed only if discretion was abused . . ..

*United States v. Werner*, 620 F.2d 922, 926 (2d Cir. 1980); *accord United States v. Brown*, 16 F.3d 423, 426-27 (D.C. Cir. 1994); *see also* 1A CHARLES ALAN WRIGHT, FEDERAL PRACTICE & PROCEDURE § 227, at 573 & n.1 (3d ed. 1999).[33]

---

[32] The government need only allege "the facts necessary to sustain joinder," not prove them. *Halliman*, 923 F.2d at 883; *Friedman*, 854 F.2d at 561.

[33] The joinder and severance of D.C. Code offenses follows these same standards. The U.S. District Court for the District of Columbia has jurisdiction over "[a]ny offense under any law applicable exclusively to the District of Columbia" if the "offense is joined in the same information or indictment with any Federal offense." D.C. Code § 11-502(3). To be "joined" under § 11-502 means to be "properly joined under" Rule 8. *United States v. Jackson*, 562 F.2d 789, 793

We have no doubt that the district court correctly permitted the joinder of the D.C. Code offenses and the charges related to 37th Street under Rule 8(b).[34] The indictment alleged that all of these counts were overt acts in furtherance of the narcotics conspiracy and predicate acts in furtherance of the RICO conspiracy. This provided the necessary link to satisfy Rule

---

(D.C. Cir. 1977) (internal quotation marks omitted); *see also United States v. Richardson*, 161 F.3d 728, 733 (D.C. Cir. 1998). Here Rule 8(b) governed the joinder of the D.C. Code offenses because there are multiple defendants. *See Jackson*, 562 F.2d at 793-94; *see also Halliman*, 923 F.2d at 882-83. Section 11-502 does not, however, specifically address severance after initial joinder. Rather, it speaks only to the joining of counts "in the same information or indictment with any Federal offense." D.C. Code § 11-502(3). But once they were joined, the D.C. Code offenses operated like other federal offenses for purposes of severance. *Cf. Jackson*, 562 F.2d at 798. "[T]he trial judge ha[d] a continuing duty," under Rule 14, "at all stages of the trial to grant a severance if prejudice d[id] appear." *Schaffer*, 362 U.S. at 516.

[34] When multiple defendants are tried together, the joinder of counts is governed by Rule of Criminal Procedure 8(b), even though Rule 8(a) would appear exclusively to deal with the joinder of offenses. *See Brown*, 16 F.3d at 427; *Halliman*, 923 F.2d at 882-83; *United States v. Perry*, 731 F.2d 985, 989 (D.C. Cir. 1984); *Jackson*, 562 F.2d at 793-94; *see also* 1A WRIGHT, *supra*, § 143, at 22; *id* § 144, at 44. Rule 8(b) states that an

> indictment . . . may charge 2 or more defendants if [the government alleges that they] have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b).

8(b).[35] *See Irizarry*, 341 F.3d at 289-90; *Spriggs*, 102 F.3d at 1255-56; *Friedman*, 854 F.2d at 561; *see also Schaffer*, 362 U.S. at 513-14; 1A WRIGHT, *supra*, § 144, at 53-54.

Carson and Martin's argument, however, focuses on evidence at trial. As such, the argument is under Rule 14, not Rule 8. *See Irizarry*, 341 F.3d at 286; *cf. Clarke*, 24 F.3d at 262; *Schaffer*, 362 U.S. at 516; 1A WRIGHT, *supra*, § 144, at 79-80. Rule 14 provides that "[i]f the joinder of offenses . . . appears to prejudice a defendant . . . the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). As mentioned, the district court "has a continuing duty at all stages of the trial" to guard against any risk of prejudice. *Schaffer*, 362 U.S. at 516.

"The first hurdle in obtaining a severance under Rule 14 is a showing of prejudice," *United States v. Lane*, 474 U.S. 438, 449 n.12 (1986), which the defendant has the burden of establishing, *Spriggs*, 102 F.3d at 1256; *Brown*, 16 F.3d at 427. A showing that the defendant "may have a better chance of acquittal in separate trials" is insufficient. *Zafiro*, 506 U.S. at

---

[35] Appellants suggest that Rule 8(a) governs the joinder of the D.C. Code offenses under § 11-502(3). For this, they rely on *Richardson*, which explained that "joined" under § 11-502(3) "means 'properly joined in accordance with Rule 8(a).'" 161 F.3d at 733 (quoting *United States v. Koritko*, 870 F.2d 738, 739 (D.C. Cir. 1989)). Nothing in *Richardson*, or *Koritko* upon which it relied, indicates a departure from *Jackson*'s explanation of Rule 8 and § 11-502(3). Both *Richardson* and *Koritko* dealt with a single defendant, and the court therefore looked to Rule 8(a) to determine whether the joinder of offenses was proper. *See Richardson*, 161 F.3d at 730, 733; *Koritko*, 870 F.2d at 738-39. The statement that Rule 8(a) governed the issues in each case did not change the conclusion in *Jackson* that when there are multiple defendants, Rule 8(b) governs. 562 F.2d at 793-94; *see also Brown*, 16 F.3d at 427; *Halliman*, 923 F.2d at 882-83.

540; *accord Halliman*, 923 F.2d at 884. The Supreme Court explained that severance is warranted "under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539; *accord Brown*, 16 F.3d at 433. This may be shown, for example, by the presence of evidence admissible against one defendant but not another or by the unavailability of exculpatory evidence to a single defendant in a joint trial that would be available in a single trial. *Zafiro*, 506 U.S. at 539; *see also Halliman*, 923 F.2d at 884. Even when a defendant has demonstrated prejudice, however, severance may not be required. Our review of a district court's decision not to sever is for abuse of discretion. We may uphold the court's judgment "even if the circumstances are such that a grant of severance would have been sustainable," *Brown*, 16 F.3d at 427 (citation and internal quotation marks omitted), particularly since potential prejudice to a defendant may be obviated by jury instructions, *see, e.g.*, *Zafiro*, 506 U.S. at 539, 540; *Schaffer*, 362 U.S. at 516; *Spriggs*, 102 F.3d at 1256.

Carson and Martin's first point—that there was a risk of prejudice from the likelihood of evidentiary "spillover" or juror confusion—fails to account for the district court's limiting instructions to the jury. The district court "was acutely aware of the possibility of prejudice and was strict in his charge." *Schaffer*, 362 U.S. at 516. The court instructed the jury that it could "not infer that a defendant is guilty of participating in criminal conduct merely from the fact that he may have been present at the time and place a crime was being committed," nor could the jury "infer that a defendant is guilty of participating in criminal conduct merely from the fact that he associated with, was a family member of or lived with other people who were guilty of wrongdoing." The court also explained that the jury "should give separate consideration and render separate verdicts with respect to each defendant," and that "[e]ach defendant is

entitled to have his guilt or innocence of the crime . . . determined from his own conduct and from the evidence that applies to him as if he were being tried alone." The court further instructed that "[e]ach offense and the evidence that applies to it should be considered separately, and you should return separate verdicts as to each . . . . [T]he fact that you may find a defendant guilty or not guilty of any one count of the indictments should not control or influence your verdict with respect to any other count of the indictments." As in *Zafiro*, 506 U.S. at 540-41, and *Schaffer*, 362 U.S. at 516, these instructions cured any possible risk of prejudice. *See also United States v. Thompson*, 286 F.3d 950, 968 (7th Cir. 2002); *Brown*, 16 F.3d at 433. The jury is "presumed to follow [its] instructions." *Zafiro*, 506 U.S. at 540 (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)) (internal quotation mark omitted).

Carson and Martin contend that had they been tried separately, they could have better defended against the government's allegations through more effective cross-examination and impeachment of various witnesses. This is insufficient under Rule 14 because "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540; *accord Halliman*, 923 F.2d at 884. It follows that Carson and Martin have failed to show a risk of prejudice that might warrant severance. Without such a showing, their Rule 14 argument fails.

Martin has an additional argument—that even if the 37th-Street counts were properly joined, the evidence proved the existence of multiple conspiracies, rather than the narcotics conspiracy alleged in the indictment, and that this variance between the evidence and the indictment requires reversal. *See United States v. Childress*, 58 F.3d 693, 709 (D.C. Cir. 1995). "Variance is grounds for reversal only if [Martin] can show that the variance is material and that it substantially prejudiced

[him], such as by causing the jury to 'transfer evidence from one conspiracy to a defendant involved in another.'" *United States v. Graham*, 83 F.3d 1466, 1471 (D.C. Cir. 1996) (quoting *United States v. Tarantino*, 846 F.2d 1384, 1391 (D.C. Cir. 1988)). Whether the prosecution has proven a single conspiracy or multiple conspiracies is a question for the jury. *See Tarantino*, 846 F.2d at 1391. As such, we must view "the evidence in the light most favorable" to the government, asking "whether '*any* rational trier of fact could have found the essential elements of [conspiracy] beyond a reasonable doubt.'" *Graham*, 83 F.3d at 1471 (quoting *United States v. Washington*, 12 F.3d 1128, 1135-36 (D.C. Cir. 1994)) (alteration in original); *see also United States v. Mathis*, 216 F.3d 18, 23 (D.C. Cir. 2000). To evaluate the evidence relating to the single-versus-multiple-conspiracies issue, "we look for several factors, including whether participants shared a common goal . . .; interdependence between the alleged participants in the conspiracy; and, though less significant, overlap among alleged participants." *Graham*, 83 F.3d at 1471 (citing *Tarantino*, 846 F.2d at 1393); *accord Mathis*, 216 F.3d at 23 (quoting *United States v. Gaviria*, 116 F.3d 1498, 1533 (D.C. Cir. 1997)).

Martin contends that his activities related to 37th Street established a "separate and totally unrelated conspiracy" as opposed to the narcotics conspiracy alleged in the indictment. Br. of Appellants 161. We disagree. As the government suggests, Martin attempts artificially to "split one conspiracy into two based simply on geographic lines." Br. for Appellee 164. There was sufficient evidence for the jury to conclude that Martin's activities were part of a single conspiracy, not separate ones. Charles Bender testified that 37th Street and those associated with it were basically an extension of the K-Street organization. Others so testified. Martin's assertions that he was not involved in the charged conspiracy and that he never worked in tandem with others in selling drugs is contrary to the evidence, which showed that he frequently sold drugs on K

Street and that he participated in the "rotation" system with other members. That is, he would alternate between selling marijuana to customers (sometimes by completing a sale for a coconspirator and handing over the money) and keeping watch for police and others who could disrupt the conspiracy's activities. This was sufficient for the jury to conclude that Martin had a common goal with the others, that Martin and others were interdependent, and that the participants overlapped. *See Graham*, 83 F.3d at 1471-72. The violent acts connected with 37th Street also clearly related to the other goals of the conspiracy, which, as alleged in the indictment, were:

> to enrich the members of the conspiracy; to create, maintain, and control a market place for the distribution of its controlled substances; to enforce discipline among members of the conspiracy; to collect monies owed to members of the conspiracy; to protect the conspiracy and its members from detection, apprehension and prosecution by law enforcement; to intimidate and prevent persons from testifying as witnesses in criminal prosecutions against members of the conspiracy; to prevent, thwart, and retaliate against acts of violence perpetrated by rivals against the conspiracy and its members; and to promote and enhance the reputation and standing of the enterprise and its members.

The evidence at trial did not materially vary from the conspiracy count alleged in the indictment, and so there is no basis to upset Martin's convictions.

### VII. Rule 804(b)(1)

Appellants next argue that the district court abused its discretion by refusing to admit into evidence the transcript testimony of two witnesses who had appeared before a Maryland grand jury investigating the triple murders of Alonzo

Gaskins, Darnell Mack, and Melody Anderson. Appellants contend that this testimony would have supported their story that they were not involved with the triple murders. Because this hearsay testimony was not within the exception for former testimony, we conclude that the district court did not abuse its discretion by barring its use at trial.

On December 10, 1996, less than one month after the triple murders, the State Attorney for Prince George's County called Cheree Owens and her fiancé John Pinkney to testify before a state grand jury investigating the crime. Owens and Pinkney testified that they lived down the street from the home where the triple murders were committed. Owens testified that, approximately two weeks after the triple murders, she overheard Dennis Green talking on his cell phone while he was visiting in her home. Owens heard Green say "that they should have came [sic] around there . . . because [we] just took three people out of the street."[36] According to Owens, the person with whom Green was speaking "must have asked him who is 'we,'" because Green responded, "me, California, and Free, and the rest of the guys." The conversation scared Owens and, after Green left her home the next day, she told Pinkney what she heard. Pinkney testified that after Owens told him about this conversation, he told Green not to return. For reasons not clear from the testimony, Green became upset with Owens and Pinkney, threatened them, and tried to extort money from them. Green told Owens that after he was " finish[ed] with you all, a whole lot of" people were "going to wind up dead around here."

Around the same time that the Maryland grand jury was hearing from Owens and Pinkney, federal officials were

---

[36] Although the grand jury transcript states that Owens testified that Green told the person he was speaking with that "*me* just took three people out of the street," the parties agree that this was a transcription error.

beginning to make a connection between the K Street gang and the triple murders. After the FBI arrested Robert Smith on December 5, 1996, for selling four pounds of marijuana, Smith agreed to tell the FBI what he knew about the K Street group and at some point during his interviews told Special Agent Lisi that "Shorty and them" committed the "triple." "Shorty" was one of Sweeney's nicknames. Using this information, the government began to build its case for the appellants' involvement in the triple murders. On September 18, 1998, a federal grand jury in the District of Columbia charged Carson, Sweeney, and Coates with the three murders and other crimes. The government filed a superceding indictment on March 25, 1999.

After the United States Marshals Service and an investigator hired by Sweeney's attorney could not locate Owens and Pinkney to call them as witnesses during the trial, Sweeney and Carson moved to admit into evidence the transcript of the Maryland grand jury testimony of Owens and Pinkney. Presumably, Sweeney and Carson hoped that the grand jury testimony would help show that Dennis Green and his associates committed the triple murders and not them. Sweeney argued that the grand jury testimony was admissible under Federal Rule of Evidence 804(b)(1), which allows for an exception to the hearsay rule for "former testimony" when the declarant is "unavailable as a witness" and "the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by . . . examination."

The government opposed the motion and argued that the Rule 804(b)(1) exception did not apply because, although neither Owens nor Pinkney was available as a witness at trial, the government—the "party against whom the testimony is now offered"—would not have had a "similar motive to develop the testimony" of Owens and Pinkney before the Maryland grand jury as it had at trial. By the time of the trial, the federal

prosecutors believed that Owens and Pinkney were falsely implicating Green in their grand jury testimony. When they appeared before the grand jury, in the earliest stages of the investigation into the triple murders, neither the government nor Maryland "had [any] reason to believe . . . that the witnesses were falsely implicating Mr. Green." It was only much later that the government came "to believe that [it was] being used by Pinckney [sic] and Owens." The government explained:

> This belief [that Pinkney and Owens were "using" the government] was based on the fact that Pinckney [sic] and Owens were given a considerable amount of money that was to be used for their relocation and was meant to last several weeks. The pair went through the funds in a matter of days and then demanded additional funds. The police also learned that Pinckney [sic] and Owens owed Dennis Green—the person they implicated in the triple murder—money for drugs. After investigating more fully, the police found nothing to corroborate the stories of Pinckney [sic] and Owens. A short time later, Pinckney [sic] and Owens seemingly disappeared.

The district court agreed with the government that the motive of the State's Attorney to develop the testimony of Pinkney and Owens before the grand jury and the government's motive to develop their testimony at trial were not "similar" and therefore denied the appellants' motion.

The appellants challenge this ruling. We review a trial court's refusal to admit grand jury testimony of unavailable witnesses for abuse of discretion, *United States v. Miller*, 904 F.2d 65, 68 (D.C. Cir. 1990), and find none here. "The hearsay rule prohibits admission of certain statements made by a declarant other than while testifying at trial." *United States v. Salerno*, 505 U.S. 317, 320 (1992); *see also* Fed. R. Evid. 801(c), 802. In certain circumstances, Rule 804(b)(1) allows an exception to the rule against hearsay for former testimony:

"Testimony given [by a declarant] as a witness at another hearing of the same or a different proceeding" is not "excluded by the hearsay rule if the declarant is unavailable as a witness" and "if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Both parties agree that the failure of the Marshals Service and counsel for Sweeney to locate Owens and Pinkney made them "unavailable" as witnesses at trial. *See* Fed. R. Evid. 804(a)(5) ("'Unavailability as a witness' includes situations in which the declarant . . . is absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance . . . by process or other reasonable means."). The only issue, then, is whether "the party against whom [their] testimony [would be offered] . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

The district court here held that the Rule 804(b)(1) exception did not apply, stating that "in the absence of an identity of motive on the part of the government, that testimony is not admissible." We agree. Even were it possible to consider the United States and Maryland a single party for purposes of Rule 804(b)(1), and, as we discuss below, we do not see how they could be on these facts, the appellants have failed to show how the motive to develop the testimony of Owens and Pinkney before the grand jury was similar to the motive to develop their testimony at trial. Rule 804(b)(1) provides that "the party against whom the testimony is . . . offered [must have] had an opportunity and *similar motive* to develop the testimony by direct, cross, or redirect examination." Fed. R. Evid. 804(b)(1) (emphasis added).

In *Salerno*, 505 U.S. at 321-22, the Supreme Court addressed this similarity of motive requirement. In that case, seven defendants were accused of taking part in a criminal organization that committed fraud in the New York construction

industry. The defendants sought to introduce into evidence potentially exculpatory testimony of grand jury witnesses who were unavailable to testify at trial. The Court rejected any presumption that a prosecutor's motives to develop testimony before the grand jury and at trial are similar and held that respondents could not make use of Rule 804(b)(1), unless they could "demonstrate" that the government, in fact, had a "similar motive" to develop the testimony in both proceedings. *Id*. at 325. On remand from the Supreme Court, the Second Circuit held that district courts are to make "fact-specific" inquiries into the motives of the prosecution during these different stages of the investigation and trial. Instead of remanding to the district court to conduct this inquiry, the Second Circuit conducted this inquiry itself in order to "avoid further delay" and "because [the case was an] unusual case in which it [could] be shown beyond reasonable dispute that the prosecutor had no interest at the grand jury in proving the falsity of the witnesses' assertion." *United States v. DiNapoli*, 8 F.3d 909, 915 (2d Cir. 1993) (en banc). It stated: "If a prosecutor is using the grand jury to investigate possible crimes and identify possible criminals, it may be quite unrealistic to characterize the prosecutor as the 'opponent' of a witness's version. At a preliminary stage of an investigation, the prosecutor is not trying to prove any side of any issue, but only to develop the facts to determine if an indictment is warranted." *Id*. It therefore held that the government did not have a similar motive to develop testimony at these two stages of the litigation. *Id.*; *see also United States v. Omar*, 104 F.3d 519, 523 (1st Cir. 1997) ("In an ordinary trial, the positions of the parties vis-a-vis a witness are likely to be clear-cut: the witness is normally presented by one side to advance its case and cross-examined by the other to discredit the testimony. . . . Grand juries present a different face. Often, the government neither aims to discredit the witness nor to vouch for him. The prosecutor may want to secure a small piece of evidence as part of an ongoing investigation.").

We agree with our sister Circuits that district courts should apply a fact-specific inquiry to determine whether prosecutors had a similar motive to develop the testimony at the grand jury proceeding as they would have at trial. *Battle ex rel. Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 552 (5th Cir. 2000) (district courts are to apply fact-specific inquiry when assessing similar motive); *Omar*, 104 F.3d at 523 (same); *DiNapoli*, 8 F.3d at 914 ("Our point is simply that the inquiry as to similar motive must be fact specific, and the grand jury context will sometimes, but not invariably, present circumstances that demonstrate the prosecutor's lack of a similar motive."); *see also Salerno*, 505 U.S. at 326 (Blackmun, J., concurring) ("the similar-motive inquiry, in my view, is inherently a *factual* inquiry, depending in part on the similarity of the underlying issues and on the context of the grand jury questioning.") (emphasis in original). The district court made this inquiry here and we hold that it did not abuse its discretion in finding that the government did not have a "similar motive" to develop the testimony at these two stages of the prosecution. Like the grand jury proceedings in *DiNapoli* and *Omar*, the purpose of the Maryland grand jury proceeding was to investigate a crime and identify possible criminals. The state prosecutor was not attempting to prove that the appellants were involved in the triple murders. In fact, we can find nothing in the record that suggests that Maryland state authorities at this point even suspected that the appellants were involved. Rather, the state prosecutor was either examining Owens and Pinkney to see if they could provide information that would lead to the perpetrators of the crime or questioning them to make a case for indicting Green and his associates. If Owens and Pinkney had been available to testify at trial, the federal prosecutors' motives in questioning them would have been entirely different. Because the witnesses' testimony tended to exculpate the appellants, the prosecutor at trial would not have used his time questioning the two to elicit testimony that might help the

appellants. Rather he would have tried to show that the grand jury testimony of Owens and Pinkney was false.

Our decision in *United States v. Miller*, 904 F.2d 65, 68 (D.C. Cir. 1990), does not conflict with our holding here. In that case, we held that the defendants could introduce at trial the testimony of an unavailable witness who had testified before a grand jury. *Id*. at 66. We did not, as the appellants argue here, establish a blanket rule that grand jury testimony is always admissible at trial under Rule 804(b)(1). In fact, it was only after we "examined [the witness's] grand jury testimony [to see if] the government's position in the second proceeding would differ from the first" and determined that it would not, that we concluded that the Rule 804(b)(1) exception applied. *Id.* at 68 n.3. After examining the grand jury testimony of Owens and Pinkney, we reach the opposite conclusion here. The position of the United States in the trial was substantially different from the position of Maryland before the grand jury. We therefore agree with the district court that there was no similarity of motive here.

We further note that the district court could have refused to admit the evidence for a more simple reason—the "party against whom the testimony is now offered," the United States, never "had an opportunity" to "develop the testimony" of Pinkney or Owens before the Maryland grand jury. Maryland and the United States are separate sovereigns and, in the absence of evidence that the United States controlled the Maryland investigation, they should not be treated as the same party for purposes of Rule 804(b)(1). Maryland had the opportunity to develop the testimony of Owens and Pinkney before the grand jury. The United States did not. In *United States v. Peterson*, 100 F.3d 7, 12 (2d Cir. 1996), the Second Circuit analyzed whether New York and the United States should be treated as the same party under Rule 804(b)(1). In that case, a New York grand jury had indicted the defendant for firearm possession.

The charges were dropped, but a federal grand jury later indicted the defendant for possession of a firearm by a felon. During his federal trial, the defendant sought to introduce into evidence his state grand jury testimony in which he claimed that the firearm was not his but that an associate handed it to him as police officers saw him. *Id*. at 10. At trial, the defendant declined to testify, invoking his Fifth Amendment privilege against self-incrimination. He argued that by doing so, he was "unavailable as a witness" and that his former testimony should be admitted under Rule 804(b)(1). *Id*. at 11.

The Second Circuit held that the defendant could not take advantage of Rule 804(b)(1) by creating his own unavailability, *id*. at 13, but addressing the issue before us, held that the defendant could not use the "former testimony" exception because the United States was not a party to the state grand jury proceedings. *Id*. at 12. The Court relied upon the reasoning in *Heath v. Alabama*, 474 U.S. 82, 88-89 (1985), which held that Alabama and Georgia could each prosecute a defendant for the same actions without offending the Double Jeopardy Clause of the Constitution because they were separate sovereigns. *Id*. Applying this logic to Rule 804(b)(1), the Second Circuit held that because New York and the United States were separate sovereigns they were separate parties for purposes of Rule 804(b)(1). *Peterson*, 100 F.3d at 12. The opportunity of New York to develop testimony before the grand jury could not be charged against the United States. *Id*. We see no reason why the district court could not have used the same reasoning to reach the same conclusion here. Maryland and the United States are separate sovereigns, and it was Maryland—and not the United States—that "develop[ed] the testimony" before the state grand jury.

In unusual circumstances not present here, separate sovereigns may be treated as one for the purposes of the Rule 804(b)(1) exception. In *United States v. Rashed*, 234 F.3d 1280,

1281 (D.C. Cir. 2000), the defendant was suspected of placing a bomb on a commercial flight from Tokyo to Honolulu on an American-owned airline. An international investigation led to his arrest by authorities in Greece. The United States sought his extradition, but the Greek authorities refused and prosecuted him in Greece, where he was convicted and imprisoned in a Greek jail for eight and a half years. *Id*. After his release from prison, the FBI arrested him, and the United States brought its own charges against him. *Id*. The defendant argued that the Double Jeopardy Clause of the Constitution barred his prosecution because, although Greece and the United States would typically be considered separate sovereigns, in this instance, the Greek prosecution was "a sham and a cover for a federal prosecution." *Id*. at 1282. We agreed that the Double Jeopardy Clause might preclude his prosecution by the United States if Greece "had been 'merely a tool of the federal authorities' or [if] its prosecution had been 'a sham and a cover for a federal prosecution.'" *Id*. (quoting *Bartkus v. Illinois*, 359 U.S. 121, 123-24 (1959)). We held, however, that "extensive" cooperation between the United States and Greece did not make his Greek trial a cover for a federal prosecution. *Id*. at 1283. "[E]xtensive law enforcement and prosecutorial cooperation between two sovereigns does not make a trial by either a sham." *Id*. at 1284.

That same reasoning applies here. If federal authorities control the actions of a state prosecutor before the grand jury, it may well be that the state and the federal governments should not be considered separate sovereigns for the purposes of Rule 804(b)(1). But here, the appellants have offered no evidence that the state authorities who directed the testimony before the Maryland grand jury were in any way controlled or even used by federal authorities. The only evidence the defendants point to is testimony from FBI Special Agent Lisi: "We [the FBI] tried to keep them [the Prince George's County Police] involved. Their primary focus was the triple murder. We tried to let them know

everything we [had] on the triple murder." This showing falls far short of the mark we set in *Rashed.* It fails to suggest federal control over the Maryland prosecutor and providing information to Maryland authorities does not of itself turn the state grand jury proceeding into a "tool" for federal authorities.

## VIII. Sentencing

Finally, we turn to the appellants' challenges to their sentences under *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Coles*, 403 F.3d 764 (D.C. Cir. 2005). Appellants argue that the district court erred under *Booker* when it imposed their sentences and that our decision in *Coles* requires us to remand their case to the district court because, they assert, the record is insufficient to determine if the district court's errors were prejudicial. We conclude that a remand is not required and affirm each appellant's sentence.

The district court sentenced the appellants to lengthy terms of imprisonment. Each received at least a life sentence, which, for some appellants, was mandated by statute apart from the United States Sentencing Guidelines ("Guidelines"). Each also received consecutive sentences beyond life imprisonment, some again mandated by statute but others set at the trial court's discretion. All together, Carson received a life sentence followed by 220 years of consecutive time, 85 years of which were mandated by statute.[37] Both Sweeney and Coates received

---

[37] The district court sentenced Carson to concurrent life sentences for each of the federal offenses: narcotics conspiracy, RICO conspiracy, attempted murder in aid of racketeering, and four counts of murder in aid of racketeering. It also imposed, consecutively, a statutorily-mandated 5-year sentence for the federal offense of use of a firearm during and in relation to attempted murder and 20 years each on four additional counts of use of a firearm during and in relation to murder. Finally, the district court imposed consecutive sentences for each of the D.C. offenses for which he was convicted: 20-years-to-life

a life sentence followed by 85 years of statutorily-mandated consecutive time.[38] Hill initially received two consecutive life sentences. After the district court determined, however, that the Guidelines did not allow consecutive life sentences on federal counts, Hill received a life sentence followed by a consecutive sentence of 20-years-to-life.[39] Martin received a life sentence

--------

for each of five counts of first degree murder while armed, 30-years-to-life on a sixth count of first degree murder while armed, and 5 years on assault with intent to kill while armed.

[38] Sweeney received concurrent life sentences for each of the federal offenses: narcotics conspiracy, RICO conspiracy, and four counts of murder in aid of racketeering. Likewise, Coates received concurrent life sentences for each federal offense of narcotics conspiracy, RICO conspiracy, and three counts of murder in aid of racketeering. Each also received a 20-year concurrent sentence for the federal offense of attempted murder in aid of racketeering, as well as a statutorily-mandated 5-year consecutive sentence for the federal offense of use of a firearm during and in relation to attempted murder, and 20 years each on four additional counts of use of a firearm during and in relation to murder.

[39] The district court sentenced Hill to consecutive life sentences for the federal offense of narcotics conspiracy and RICO conspiracy. It also sentenced Hill to a concurrent term of 20-years-to-life for the D.C. offense of first degree murder and an 80-year concurrent sentence for 16 counts of the federal offense of possession with intent to distribute marijuana. Joint Appendix at 3897-98. After determining that the Guidelines did not allow consecutive life sentences on federal counts, the court imposed concurrent life sentences for the narcotics and RICO conspiracies, and then a 20 year to life sentence for the D.C. offense of first degree murder to run consecutively to federal life sentences. Finally, the district court imposed an 80 year concurrent sentence for sixteen federal counts of possession with intent to distribute marijuana.

followed by 28-years-to-life of consecutive time, 5 years of which were mandated by federal statute.[40]

In setting these sentences, the district court treated the Guidelines as mandatory. It made no statements regarding what it might have done were the Guidelines only advisory, nor did it provide alternative sentences. None of the appellants objected. At issue before us is whether the district court's sentencing of the appellants is consistent with *United States v. Booker*, 543 U.S. 220 (2005), and this Court's subsequent application of *Booker*.

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court, concerned about legislative attempts to restrict a trial court's discretion in sentencing through the mandated use of judicial fact finding to enhance sentences, held that the Sixth Amendment right to trial by a jury requires that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id*. at 480. *Booker* applied that rule to the United States Sentencing Guidelines that had governed sentencing in the federal courts since 1987 and invalidated those provisions of the Sentencing Reform Act, 18 U.S.C. §§ 991-998, 3551-3626, that required a trial court, acting pursuant to the Guidelines, to fix a sentence that goes beyond the maximum sentence authorized by the facts

---

[40] The district court sentenced Martin to concurrent life sentences for the narcotics conspiracy and RICO conspiracy, 15 years for distribution of marijuana, and 5 years for possession with intent to distribute marijuana. It also imposed a statutorily-mandated 5-year consecutive sentence for the federal offense of use of a firearm during and in relation to murder. Finally, the district court imposed consecutive sentences for each D.C. offense for which he was convicted: 20-years-to-life for first degree armed robbery and 40 to 120 months for assault of a police officer with a weapon.

"admitted by the defendant or proved to a jury beyond a reasonable doubt." 543 U.S. at 244, 260. As a result, the Guidelines are no longer mandatory and are "effectively advisory." *Id.* at 245, 265.

The government acknowledges that the district court applied the Guidelines to the appellants as if they were mandatory. That is error under *Booker*. *See Coles*, 403 F.3d at 767 (the district court's application of "the Guidelines on the assumption that they were mandatory . . . was [an] error.")

We have distinguished between those misapplications of the Guidelines in which a sentencing court increases a "sentence beyond the maximum that could have been imposed based solely on the facts reflected in the jury verdict," which, because they violate the Sixth Amendment are constitutional *Booker* errors, and those cases in which the court's error was only the mandatory, as opposed to advisory, treatment of the Guidelines. *See United States v. Simpson*, 430 F.3d 1177, 1182-83 (D.C. Cir. 2005). We call these latter errors non-constitutional *Booker* errors, and that is the type of post-*Booker* sentencing mistake asserted by appellants. Because the appellants did not preserve their challenge to this error before the trial court, we review the district court's decision under the plain error standard set forth in *Coles*. Applying this standard, we must determine whether the district court's error affected the defendant's "substantial rights in a material way." 403 F.3d at 767.[41] In making this assessment, "we must determine whether there would have been a materially different result, more favorable to the defendant,

---

[41] In *United States v. Coumaris*, 399 F.3d 343, 351 (D.C. Cir. 2005), we held that preserved constitutional *Booker* errors are reviewed for harmless error "beyond a reasonable doubt." In such cases, the government has the burden of showing that the error was harmless. *Id.*

had the sentence been imposed in accordance with the post-*Booker* sentencing regime." *Id.*

In *Coles*, we contemplated three potential outcomes of this review. First, "there undoubtedly will be some cases in which a reviewing court will be confident that a defendant has suffered no prejudice" such as where the judge imposes a "sentence at the statutory maximum and [states] that if he could he would have imposed an even longer sentence." *Id.* at 769 (citation omitted). In those cases, we affirm the sentence. Second, "there will be some cases in which we are confident that the defendant suffered prejudice [such as] where the . . . judge indicated on the record that, but for the Guidelines, she would have imposed a lower sentence." *Id.* In those cases, we remand for full resentencing.[42] Third, as was the case in *Coles*, there will be cases where "the record simply is not sufficient for an appellate court to determinate prejudice with any confidence." *Id.* In those cases, we undertake the now-familiar *Coles* remand:

> [W]e conclude that, because the record is insufficient to determine whether the error was prejudicial, we will remand the record to the District Court so that it may determine whether it would have imposed a different sentence materially more favorable to the defendant had it been fully aware of the post-*Booker* sentencing regime. In making this determination, the District Court need not determine what that sentence would have been. And while the District Court should obtain the views of counsel, at least in writing, [it] need not require the presence of the Defendant.

---

[42] We recently clarified this standard in *United States v. Gomez* and held that "if the record establishes a *reasonable likelihood* that the sentence would have been lower, we remand for full resentencing." 431 F.3d 818, 824 (D.C. Cir. 2005) (emphasis added).

*Id.* at 770 (citations and quotation marks omitted).[43]

The purpose of a *Coles* remand is to determine whether a trial court's non-constitutional *Booker* error affected a defendant's substantial rights. *Id*. at 767. As the Seventh Circuit stated, in language we relied upon in *Coles*: "The only practical way (and it happens also to be the shortest, the easiest, the quickest, and the surest way) to determine whether the kind of plain error argued in these cases has actually occurred is to ask the district judge." *United States v. Paladino*, 401 F.3d 471, 483 (7th Cir. 2005) (quoted in *Coles*, 403 F.3d at 770).

Appellants' central argument is that the "record of [their] sentencing proceeding is the paradigm case for a remand for redetermination because of its lack of clarity regarding the effect of a mandatory sentencing scheme on the decision of the district judge." We disagree. No remand is needed for Carson, Coates, and Sweeney because the Violent Crime in Aid of Racketeering statute (VICAR), 18 U.S.C. § 1959(a)(1), and not the Guidelines, mandates that each of them receives a life sentence for their convictions. *Booker* cannot help them. They would not receive a "materially different" and "more favorable" sentence after *Booker*. *See Coles*, 403 F.3d at 767. Likewise, we conclude that no remand is needed for Martin and Hill because the district court used its discretion to lengthen their terms of imprisonment beyond what was mandated by the Guidelines. We are thus confident that Martin and Hill would not have

---

[43] Appellants argue that our "*Coles* decision is in error and that the rule followed by the Fourth Circuit in [*United States v. Hughes*, 401 F.3d 540 (4th Cir. 2005) (on reh'g)] (of automatic remand) is the proper rule." That argument is misplaced because we are, of course, bound to follow circuit precedent absent contrary authority from an en banc court or the Supreme Court. *See Brewster v. Commissioner*, 607 F.2d 1369, 1373 (D.C. Cir. 1979).

received a more favorable sentence from the district court under *Booker*.

    A. *Samuel Carson, William Sweeney, Sean Coates*.

No review of the record on remand is needed to know with certainty that Carson, Coates, and Sweeney would not have received materially different and more favorable sentences under *Booker* than those imposed by the trial court before *Booker*. VICAR itself imposes a mandatory life sentence quite apart from anything required by the Guidelines. *See* 18 U.S.C. § 1959(a)(1).[44] The district court, ruling before *Booker*, mistakenly applied the Guidelines as if they were mandatory and

---

[44] Section 1959 provides:

(a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished—

    (1) for *murder*, by death or *life imprisonment*, or a fine under this title, or both[.]

18 U.S.C.A. § 1959 (emphasis added). We, like the Second Circuit, reach the common sense conclusion that the VICAR statute does not permit a fine to be levied in lieu of imprisonment or death. *See United States v. James,* 239 F.3d 120, 127 (2d Cir. 2000) ("We see no basis for concluding that Congress intended the unlikely result that . . . a judge was free to reject a death sentence or life imprisonment for a defendant convicted under 18 U.S.C. § 1959(a)(1), but only by sentencing that defendant to a fine without prison time.").

sentenced Carson, Coates, and Sweeney each to multiple concurrent life sentences for their convictions of murder in the aid of racketeering. That was a mistake without consequence. No remand is needed because its inevitable outcome would be the imposition (again) of life sentences, only this time required by the mandatory language of VICAR instead of the Guidelines. *See id*.

Under *Coles*, a remand is inappropriate in those cases in which a statute requires the imposition of a sentence that is not materially different and more favorable than the sentence announced by the trial court under a mistakenly mandatory application of the Guidelines. "In assessing whether a district court committed prejudicial error under *Booker*, an appellate court must determine what the sentencing court would have done had it not committed the error." *Coles*, 403 F.3d at 768. Here, had the district court not erred by treating the Guidelines as mandatory, it would have still been without discretion to do anything other than impose a life sentence on each of the appellants under VICAR. Because we are "confident that the sentence would not have been lower" for Carson, Coates, or Sweeney, we affirm their sentences without remand. *See Gomez*, 431 F.3d at 824.[45]

B. *Vincent Hill and Jerome Martin.*

No remand is needed for Hill and Martin either. The district court, again applying the Guidelines as if they were mandatory, sentenced Hill and Martin to life sentences for their federal convictions. When it came to sentencing the two for their D.C.

---

[45] Coates made two other arguments attacking his sentence: (1) the district court erred in preventing him from presenting factors outside the Sentencing Guidelines; and (2) the district court mistakenly enhanced his sentence based on judge-found facts. Because any sentencing court would be required to impose a life sentence under VICAR, these arguments also fail.

convictions, the district court had discretion to impose sentences either concurrent with or consecutive to the life sentences for their federal convictions. The district court exercised its discretion and chose the more severe option that added consecutive sentences onto their life terms. That choice makes us confident that Hill and Martin would have fared no better had the district court viewed the Guidelines as only advisory. A mandatory application of the Guidelines, though mistaken, does not, by itself, trigger a *Coles* remand. The touchstone of our analysis is whether we can, from the record, confidently predict what the trial court would have done under *Booker*. Our decision in *United States v. Smith*, 401 F.3d 497 (D.C. Cir. 2005), is instructive.

In *United States v. Smith*, the trial court, treating the Guidelines as mandatory, twice exercised its discretion to make an upward departure to impose a prison term that exceeded what the Guidelines called for.[46] *Id*. at 499. The case reached us on a *Booker* challenge to the mandatory use of the Guidelines. We held that although the trial court erred, there was no need to remand the case for resentencing because the two discretionary upward departures made us confident that the trial court was not compelled by the Guidelines to impose a sentence more severe than its independent judgment would have determined most appropriate in a world governed by *Booker*. *Id*. If anything, the mandatory guidelines seemed to have placed a cap on the defendant's sentence. We are confident that had the trial court acted under *Booker*, the defendant's sentence would have been

---

[46] The district judge initially imposed a sentence of 46 months by departing upwards from the Guidelines sentence. *Id*. at 498-99. That decision was vacated and the case remanded on grounds other than *Booker*. *Id*. The district judge then imposed a sentence of 21 months after departing upwards a second time. *Id*. It was upon appeal of this sentence that the defendant raised the *Booker* challenge to his sentence that led to our decision in *Smith*.

at least as severe as it was before *Booker*. Where the record supports that confidence, there is no need for a *Coles* remand.

Like the upward departures in *Smith*, the district court's decision to impose consecutive sentences for Hill and Martin tacked on to the sentences they had already received convinces us that they were not prejudiced by the court's mistaken view of the Guidelines. *Id*. "[C]onfident that the sentence would not have been lower" for either Hill or Martin in a post-*Booker* sentencing regime, we affirm their sentences. *See Gomez*, 431 F.3d at 832.[47]

For the foregoing reasons, we affirm all of the appellants' convictions and the sentences imposed therefor.[48]

*So ordered*.

---

[47] Because we affirm Hill's sentence for his first degree murder convictions, we need not address his constitutional *Booker* challenge to his other convictions. The sentences for those convictions run concurrent to his life sentence, thus no prejudice would result from a constitutional *Booker* error by the district court. *See Coles*, 403 F.3d at 767.

[48] We summarily affirm the district court as to any issue not specifically addressed in this opinion.